Allan Kyle DAVIS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2001–CA–002262–MR.

Court of Appeals of Kentucky.

Oct. 10, 2003.

As Modified Oct. 31, 2003.

Bill Barber, Owensboro, KY, for appellant.

Albert B. Chandler III, Attorney General, J. Gary Bale, Assistant Attorney General, Frankfort, KY, for appellee.

Before GUIDUGLI, JOHNSON and KNOPF, Judges.

## OPINION

JOHNSON, Judge.

Allan Kyle Davis has appealed from the final judgment and sentence entered by the McLean Circuit Court on October 11, 2001, following his conditional plea of guilty to the charges of trafficking in a controlled substance within 1,000 yards of a school,[1] possession of a controlled substance in the first degree (methamphetamine),[2] possession of marijuana,[3] possession of drug paraphernalia,[4] and cultivation of marijuana, five or fewer plants, while in the possession of a firearm.[5] Having concluded that the trial court properly denied Davis's motion to suppress all of the evidence seized during the search of his residence, we affirm.

On February 1, 2001, McLean County Deputy Sheriff Jeff Palmer received information from another deputy that Rodney Crick, a man wanted in connection with an outstanding arrest warrant, was residing with Davis at his mobile home in Island, McLean County, Kentucky. Deputy Sheriff Palmer contacted Kentucky State Police Trooper Chuck Payne and the officers proceeded to Davis's residence. When the officers arrived at Davis's mobile home, Trooper Payne went around to the back door and Deputy Palmer walked up to the front door and proceeded to knock. Deputy Palmer then heard a voice from within telling him to come inside.

Upon entering the living room of Davis's home, Deputy Palmer immediately noticed a thick haze of smoke and he smelled the distinct odor of burnt marijuana. Deputy Palmer also noticed two partially burnt marijuana cigarettes in an ashtray on the coffee table in the living room. Davis was sitting on a couch in the living room along-

1. Kentucky Revised Statutes (KRS) 218A.1411.

2. KRS 218A.1415. Davis entered a plea pursuant to *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), on the methamphetamine charge.

3. KRS 218A.1422.

4. KRS 218A.500.

5. KRS 218A.1423 and KRS 218A.992.

side a Mr. Fields.[6] Deputy Palmer immediately radioed Trooper Payne, who came around to the front and entered the residence. Davis and Fields were placed under arrest. The officers then noticed a loaded handgun,[7] rifles, and a shotgun in plain view. In addition, Trooper Payne found a Browning nine millimeter handgun stuffed between the cushions in the sofa where Fields had been seated.

Both officers then asked Davis if anyone else was present and they informed him that they were looking for Rodney Crick. Davis stated that there was no one else in the mobile home. Soon thereafter, Johnny Revlett was seen coming from the back of the mobile home. Deputy Palmer immediately conducted a pat down search of Revlett, found a syringe on him, and placed him under arrest.

Since the officers continued to be concerned that someone else might still be present in the mobile home, Deputy Palmer proceeded to search the other rooms of the mobile home in an attempt to locate Rodney Crick or any other person and to safely secure the area. Trooper Payne remained in the living room with the three suspects. Upon opening the closet door in the master bedroom, Deputy Palmer found a marijuana growing operation which consisted of several hanging lamps and three marijuana plants. Deputy Palmer also found a baggie full of marijuana and a

triple slide scale in an adjacent bedroom.[8] Sitting on top of the scale was a large trash bag, which also contained a large amount of marijuana residue. Deputy Palmer also noticed a glass pipe on a dresser in the bedroom and other firearms were found in the bedroom as well.

Trooper Payne also found a plastic bag filled with what appeared to be methamphetamine in a ceramic container on the kitchen counter and a metal box which contained some baggies and two hemostats.[9] The ceramic container was sealed and Trooper Payne only discovered the contraband upon removing the lid to the dish. The ceramic container was located approximately eight to ten feet from the couch where Davis had been sitting.[10]

Davis was subsequently charged by a McLean County grand jury in an indictment filed on April 18, 2001, with trafficking in a controlled substance within 1,000 yards of a school, while in the possession of a firearm; possession of a controlled substance in the first degree, while in the possession of a firearm; possession of marijuana, while in the possession of a firearm; possession of drug paraphernalia; and cultivation of marijuana, five or fewer plants, while in the possession of a firearm. On May 23, 2001, Davis filed a motion to suppress the evidence seized from his residence, arguing that the search did not fall within any of the exceptions to the search

---

6. Fields's first name does not appear in the record.

7. Deputy Palmer testified at the suppression hearing that he could tell the handgun was loaded because he could see through the cylinder.

8. Both the marijuana and the scale were found in plain view in the bedroom.

9. A hemostat is a long-handled clamp used to control bleeding in surgery. The device is commonly referred to by marijuana smokers as a "roach clip." As for the metal box and

the baggies and hemostats found inside the box, the trial court granted Davis's motion to suppress due to the fact that neither of the officers could remember where the box was located or how it was found.

10. The record is unclear as to the exact size of the ceramic container, however, it was described by Trooper Payne as "some kind of little knick knack. Like to me, something a lady would have on her dresser or something."

warrant requirement and therefore was violative of Section 10 of the Kentucky Constitution and the Fourth Amendment to the United States Constitution.

A suppression hearing was held on May 29, 2001, and the trial court entered an order denying Davis's motion to suppress on June 22, 2001. The trial court found that since Deputy Palmer was asked to come inside the mobile home, his entry was consensual.[11] The trial court then concluded that any contraband Deputy Palmer saw in plain view when he first entered the mobile home was admissible pursuant to the "plain view" exception to the search warrant requirement.[12] As for the contraband found in the bedrooms, the trial court reasoned that since the officers had reason to fear for their safety, they had a right to enter the other rooms of the mobile home to look for another person. Thus, the marijuana growing operation, other firearms, glass pipe, and marijuana residue were all held to have been properly seized. The Browning nine millimeter found between the cushions of the sofa was also held to have been lawfully seized as it was within the immediate vicinity of Davis at the time of his arrest.

The more difficult question before the trial court pertained to the items seized from the ceramic container found on the kitchen counter. The ceramic container was located approximately eight to ten feet from the couch where Davis was sitting when the officers entered his mobile home. It appears from the record below that the living room and kitchen were immediately adjacent to one another. The trial court described the living room and kitchen as "one large open area." Based upon these circumstances, the trial court concluded that the ceramic container, and the methamphetamine found therein, were admissible as they were within Davis's immediate control.[13]

On September 19, 2001, Davis entered a conditional plea of guilty and an *Alford* plea to the charge of possession of methamphetamine; and a conditional plea of guilty to the charges of trafficking in a controlled substance within 1,000 yards of a school; possession of marijuana, while in the possession of a firearm; possession of drug paraphernalia; and cultivation of marijuana, five or fewer plants, while in the possession of a firearm.[14] The final judgment and sentence of the McLean Circuit Court was entered on October 11, 2001. Davis was sentenced to four years' imprisonment on each of the felony convictions and 12 months on the misdemeanor paraphernalia conviction, with the sentences to run concurrently. This appeal followed.

Davis raises two issues on appeal. First, Davis claims the trial court abused its discretion by ruling that the evidence seized from the two bedrooms in his mobile home was admissible pursuant to the "safety check" exception to the search warrant requirement. Second, Davis claims the trial court abused its discretion

11. Davis argued before the trial court that the entry was not consensual, but concedes on appeal that there was sufficient evidence to support the trial court's findings.

12. *See Hazel v. Commonwealth*, Ky., 833 S.W.2d 831 (1992).

13. The trial court cited *Collins v. Commonwealth*, Ky., 574 S.W.2d 296 (1978), in support of its ruling.

14. Pursuant to a plea agreement with the Commonwealth, the language "and while in the possession of a firearm" was deleted from the charges of possession of a controlled substance in the first degree and trafficking in a controlled substance within 1,000 yards of a school.

by ruling that the evidence seized from the ceramic container located on the kitchen counter was justified under the "search incident to arrest" exception to the search warrant requirement.

The proper standard of review is set forth in *Commonwealth v. Neal,*[15] as follows:

> An appellate court's standard of review of the trial court's decision on a motion to suppress requires that we first determine whether the trial court's findings of fact are supported by substantial evidence. If they are, then they are conclusive. Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law [footnotes omitted].[16]

The factual findings in the case *sub judice* are not in dispute and they are clearly supported by substantial evidence consisting of the testimony presented at the suppression hearing. Thus, the question now becomes, " 'whether the rule of law as applied to the established facts is or is not violated.' "[17]

The "safety check" exception to the warrant requirement was first addressed by this Court in *Commonwealth v. Elliott.*[18] Elliott was residing with his sister in Jefferson County when the probation office received information that he had been going out of state for the purpose of obtaining illegal drugs. Upon receiving this information, several law enforcement officers went to the home of Elliott's sister, Rosetta Palmer.[19] The officers knocked on the door and were subsequently permitted to enter the residence. Once inside, they immediately located and arrested Elliott.[20] After arresting Elliott, some of the officers decided to search the rest of the house for any potential accomplices. In the process of searching Palmer's home, the officers seized several items of contraband that were located in plain view. Elliott was subsequently charged with trafficking in a controlled substance and as being a persistent felony offender in the first degree. Elliott filed a motion to suppress the evidence obtained during the search of his sister's home and the motion was granted.[21]

On appeal, the Commonwealth attempted to invoke the "safety check" exception to the warrant requirement. In declining to apply the "safety check" exception, this Court concluded that, "if the 'safety check' exception is adopted, there must be a 'serious and demonstrable potentiality for danger' " [citation omitted].[22] This Court went on to conclude that no such immediate threat or security risk existed. The following facts were central to this Court's holding:

> The parole officer testified that he had no information that Elliott's alleged "accomplice" was in the house, that Elliott

---

15. Ky.App., 84 S.W.3d 920, 923 (2002).

16. *Id.* (citing *Adcock v. Commonwealth,* Ky., 967 S.W.2d 6, 8 (1998); and *Commonwealth v. Opell,* Ky.App., 3 S.W.3d 747, 751 (1999)).

17. *Adcock, supra* at 8 (quoting *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996)).

18. Ky.App., 714 S.W.2d 494 (1986).

19. *Id.* at 495.

20. *Id.* Elliott was on parole from a manslaughter conviction. Although the officers did not have an arrest warrant, a parole officer is nonetheless authorized by statute to make an arrest upon a reasonable belief that the parolee has violated the terms of his release. KRS 439.430.

21. *Id.*

22. *Id.* at 496.

was armed or had any weapons in the house, or even that there were controlled substances in the house. Mr. Elliott offered no resistance to the arrest and the officers admittedly had several days to obtain a search warrant prior to making the arrest.[23]

Davis relies on *Elliott* and claims that "[t]he Commonwealth simply failed to prove that any serious or potential danger to the officers existed." Davis further argues that "[t]here was no violence or threat of violence by the Appellant or anyone else." We are unpersuaded by this argument, however, as the facts in the case *sub judice* are clearly distinguishable from *Elliott.*

█ Upon entering Davis's home, Deputy Palmer immediately detected the presence of smoke and the smell of burnt marijuana. He also observed in plain view a loaded handgun. Additionally, other firearms were located in the room. Moreover, after the officers were falsely informed by Davis that no one else was present, Revlett suddenly appeared from the back of the mobile home. In *Elliott*, this Court specifically declined to apply the "safety check" expectation due to the absence of such circumstances.[24] Clearly, in the case *sub judice*, the presence of a loaded handgun, rifles, a shotgun, drugs, and various individuals suspected of criminal activity constituted a " 'serious and demonstrable potentiality for danger' " [cita-

tion omitted].[25] To hold otherwise would severely undermine the ability of law enforcement officials to safely and effectively perform their duties. Accordingly, we hold that the trial court properly denied Davis's motion to suppress the items seized during the search of the bedrooms.

The methamphetamine found in the ceramic container located in the kitchen presents a far more difficult issue. Davis claims the trial court abused its discretion by ruling that the search of the ceramic container was justified under the "search incident to arrest" exception to the search warrant requirement. The Commonwealth claims that the search of the container was justified as it was within Davis's immediate control.[26] The Commonwealth relies primarily upon *Collins* in support of this argument.[27]

In *Collins*, the defendant was arrested while in a motel room after the police found an automatic pistol and 20 bags of what appeared to be heroin lying on the ground outside his window.[28] The police patted Collins down and then proceeded to search an air conditioner which was located approximately four to seven feet from where Collins was seated. A bus station locker key was found inside a small compartment of the air conditioner. A subsequent search of the locker pursuant to a warrant led to the discovery of several grams of heroin and various drug para-

23. *Id.*

24. *Id.*

25. *Id.*

26. The Commonwealth does not attempt to justify the search under the "safety check" exception to the search warrant requirement. In fact, the Commonwealth concedes that Trooper Payne's sole purpose for opening the container was to search for drugs.

27. Davis claims that *Clark v. Commonwealth,* Ky.App., 868 S.W.2d 101 (1993), is controlling. We disagree as *Clark* is clearly factually distinguishable from the case *sub judice. Clark* involved an automobile search which was predicated upon an arrest which was later determined to be arbitrary and capricious. *Id.* at 107. The arrest in the case *sub judice* was valid and did not serve as a pretext for conducting a search incident to arrest.

28. *Collins,* 574 S.W.2d at 297.

phernalia.[29] Collins filed a motion to suppress the items found within the locker, arguing that the search warrant authorizing the search of the locker was invalid because it was dependent upon the discovery of the key hidden in the air conditioner. This motion was denied.

Our Supreme Court granted discretionary review on the issue of whether the warrantless search of the air conditioner was a valid search incident to the lawful arrest of Collins. Our Supreme Court began its analysis by citing *Chimel v. California*,[30] for the proposition that "[t]he constitutionality of a search incident to an arrest turns upon whether the area searched is 'within [the arrestee's] immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."[31] Our Supreme Court then went on to cite *United States v. Robinson*,[32] for the following proposition:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found *upon the person of the suspect* [emphasis added].[33]

Our Supreme Court concluded its analysis by adopting the following position enunciated by the Sixth Circuit Court of Appeals

in *Watkins v. United States*:[34] "even after a defendant has been restrained pursuant to arrest, the search of an area from which he might gain possession of a weapon is lawful."[35] In upholding the search of the motel room, and, more specifically, the air conditioner, our Supreme Court reasoned that since the air conditioner was located within the immediate area where Collins might have reached, the search was not unconstitutional.

In order to better understand the reasoning underlying our Supreme Court's holding in *Collins*, we believe a more careful review of the principles at play in *Chimel* and *Robinson* is necessary. In *New York v. Belton*,[36] the United States Supreme Court provided a detailed discussion of the principles underlying the search incident to arrest exception to the warrant requirement. In *Belton*, the U.S. Supreme Court stated as follows:

> It is a first principle of Fourth Amendment jurisprudence that the police may not conduct a search unless they first convince a neutral magistrate that there is probable cause to do so. This Court has recognized, however, that "the exigencies of the situation" may sometimes make exemption from the warrant requirement "imperative." Specifically, the Court held in *Chimel v. California*, that a lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the

---

29. *Id.*

30. 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

31. *Collins*, 574 S.W.2d at 297 (quoting *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034).

32. 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

33. *Id.* at 235, 94 S.Ct. 467. The language "upon the person of the suspect" was omitted

from our Supreme Court's quote from *Robinson*. *Collins, supra* at 298.

34. 564 F.2d 201 (6th Cir.1977), *cert. denied*, 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978).

35. *Id.* at 204.

36. 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

immediately surrounding area. Such searches have long been considered valid because of the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence [citations omitted].[37]

. . .

Although the principle that limits a search incident to a lawful custodial arrest may be stated clearly enough, courts have discovered the principle difficult to apply in specific cases. Yet, as one commentator has pointed out, the protection of the Fourth and Fourteenth Amendments "can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement" [citation omitted]. This is because

> "Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be 'literally impossible of application by the officer in the field.' "

In short, "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront" [citation omitted].[38]

The *Belton* Court went on to discuss the interplay between *Chimel* and *Robinson:*

> So it was that, in *United States v. Robinson,* the Court hewed to a straightforward rule, easily applied, and predictably enforced: "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." In so holding, the Court rejected the suggestion that "there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest" [citations omitted].[39]

In *Belton,* the defendant was pulled over pursuant to a lawful traffic stop and was subsequently arrested for the unlawful possession of marijuana.[40] After the defendant was placed under arrest, the officer conducted a search of the automobile which yielded evidence of contraband, namely cocaine. The cocaine was found in the defendant's jacket pocket, which was left in the back seat of the car. The pocket was zipped and the cocaine was only discovered after the officer unzipped the pocket.[41]

 The United States Supreme Court upheld the search under *Chimel* and *Robinson.* The Court held that "when a

37. *Id.* at 457, 101 S.Ct. 2860.

38. *Belton,* 453 U.S. at 457–58, 101 S.Ct. 2860.

39. *Id.* at 459, 101 S.Ct. 2860.

40. Belton was not driving the car, he was a passenger along with several other men. Moreover, the car did not belong to Belton.

41. *Id.* at 455–56, 101 S.Ct. 2860.

policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" [footnotes omitted].[42] The Court went on to conclude that "the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach" [footnote and citations omitted].[43] The Court noted that such containers may be searched whether they are open or closed as "the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have."[44] The Court acknowledged the possibility that "these containers will sometimes be such that they could hold neither a weapon nor evidence of the criminal conduct for which the suspect was arrested."[45] However, the Court went on to note that this very argument was rejected in *Robinson.*[46]

■ Although *Belton* involved the search of the passenger compartment of an automobile, a close reading of the case reveals that the principles underlying the

Court's decision are not limited to the "automobile exception." It is true that footnote 3 of the opinion reads as follows:

> Our holding today does no more than determine the meaning of *Chimel's* principles in this particular and problematic content. It in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests.[47]

However, the Court went on in footnote 6 of the opinion to expressly disclaim reliance on the so-called automobile exception: "[b]ecause of this disposition of the case, there is no need here to consider whether the search and seizure were permissible under the so-called 'automobile exception' " [citations omitted].[48] Moreover, Wayne LaFave has touched on this issue in his treatise on the Fourth Amendment and we believe the following comment is particularly insightful: "the asserted need for a 'bright line' on what constitutes 'immediate control' under *Chimel*, is essentially the same as to containers in cars and other containers."[49] Thus, we conclude that the reasoning employed in *Belton* is equally applicable to all containers, with the constitutionality of the search turning upon whether the area searched was " 'within

---

42. *Id.* at 460, 101 S.Ct. 2860.

43. *Id.*

44. *Id.* at 461, 101 S.Ct. 2860.

45. *Id.*

46. " 'The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justifica-

tion.' " *Id.* (quoting *Robinson,* 414 U.S. at 235, 94 S.Ct. 467).

47. *Belton,* 453 U.S. at 460 n. 3, 101 S.Ct. 2860.

48. *Id.* at 462 n. 6, 101 S.Ct. 2860. In addition, we cannot overlook the fact that when the police officer in *Belton* searched the zipped pocket of the arrestee's jacket, which was located in the passenger compartment of the car, the arrestee was standing on the side of the highway away from the vehicle.

49. Wayne R. LaFave, *Search and Seizure,* Vol. III, Chap. 5, § 5.5(a), p. 177 (3d ed.1996). Moreover, numerous decisions from various federal courts have relied upon *Belton* to permit warrantless searches of containers inci-

his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." [50]

■ For purposes of the present analysis, we conclude that the *Belton* Court relied upon *Robinson* in precisely the same fashion as did our Supreme Court in *Collins*. That is to say, the probability that a particular container could hold a weapon or evidence of criminal conduct is irrelevant provided the search of the container was incident to a lawful arrest. The fact that our Supreme Court left out the language "upon the person of the suspect" from its citation to *Robinson* tends to suggest that the Court intended to extend the reasoning of *Robinson* to the entire area within the arrestee's immediate control and not just his person. Thus, we now turn to the question of whether the ceramic container found on the kitchen counter was within Davis's immediate control.

■■ The Commonwealth claims that the search of the air conditioner in *Collins* closely parallels the search of the ceramic container found on Davis's kitchen counter. The Commonwealth further claims that the distance involved in the case at bar, *i.e.*, eight to ten feet, is "easily congruous" with the distance involved in *Collins*, *i.e.*, four to seven feet. We agree, however, we also hasten to point out that in the search incident to arrest context, the distance between the arrestee and the area to be searched is not dispositive of the issue. Whether a search is reasonable as incident to a lawful arrest depends on the particular circumstances involved.

Unfortunately, the case law in Kentucky is rather underdeveloped as to what circumstances may or may not give rise to a valid search of the area within an arrestee's immediate control pursuant to a custodial arrest.[51] However, we believe a Sixth Circuit Court of Appeals case out of the Western District of Kentucky, *Watkins, supra*, is particularly on point and helps to shed some light on the issue. In

dent to a lawful arrest in situations were the automobile exception was entirely inapplicable. *See, e.g., United States v. Porter*, 738 F.2d 622, 627 (4th Cir.1984), *cert. denied* 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984) (warrantless search of a carry-on bag at an airport); *United States v. Litman*, 739 F.2d 137, 138–39 (4th Cir.1984) (warrantless search of a shoulder bag in a hotel room); *United States v. Silva*, 745 F.2d 840, 847 (4th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985) (warrantless search of a zipper bag in a hotel room); *United States v. Fleming*, 677 F.2d 602, 607 (7th Cir.1982) (warrantless search of paper bag in the immediate area of the defendant upheld despite the fact that at the time of the search defendant was handcuffed); *United States v. Herrera*, 810 F.2d 989, 990 (10th Cir.1987) (warrantless search of a briefcase carried by arrestee); *United States v. Tavolacci*, 704 F.Supp. 246, 252–53 (D.D.C.1988) (warrantless search of luggage at railway station). In addition, several state courts have taken a similar approach. *See, e.g., Lee v. Maryland*, 537 A.2d 235, 311 Md. 642, 670–71

(1988); *Commonwealth v. Madera*, 521 N.E.2d 738, 402 Mass. 156, 157–58 (1988); *Colorado v. Hufnagel*, 745 P.2d 242 (1987); and *New York v. Smith*, 59 N.Y.2d 454, 458, 465 N.Y.S.2d 896, 452 N.E.2d 1224 (1983).

**50.** *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034, *Collins*, 574 S.W.2d at 297. This point is further buttressed by the fact that *Chimel* provided the theoretical grounding for the Court's decision in *Belton*. Moreover, "[e]ven if we assume that the bright line test of *Belton* relates exclusively to searches involving the contents of automobiles, *Belton* nevertheless demonstrates that *Chimel's* concept of an area of control is quite flexible." *Lee*, 537 A.2d at 249.

**51.** The only Kentucky case dealing with the constitutionality of a search incident to arrest in which *Collins* is cited as authority is *Commonwealth v. Montaque*, Ky., 23 S.W.3d 629, 633 n. 1 (2000), and *Montaque* does no more than state that *Collins* stands for the position that "[t]he constitutionality of a search incident to an arrest turns upon whether the area

*Watkins,* the defendant was arrested in the residence of a friend pursuant to a valid warrant. At the time of his arrest, two bundles of heroin were found in the bathrobe Watkins was wearing.[52] The arresting officers then testified that they accompanied Watkins to the bedroom so he could get a shirt. Once in the bedroom, the officers noticed the butt of a firearm under the mattress of the bed. Watkins challenged the search claiming that the officers took him to the bedroom for the sole purpose of conducting a search, and that they only discovered the gun after lifting the mattress off the bed.[53] In upholding the search, the Sixth Circuit stated as follows:

> This Court has squarely held that even after a defendant has been restrained pursuant to arrest, the search of an area from which he might gain possession of a weapon is lawful [citation omitted]. The Court stated:
>
>> A search incident to arrest may extend to "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence" [citation omitted].[54]

The Court went on to conclude that "[s]ince the gun in question was within defendant's reach in the bedroom where he was taken to get a shirt, the seizure of the weapon under the circumstances of this arrest was lawful." [55]

 In *Collins,* our Supreme Court agreed with the position taken in *Watkins*

that "the area which may be searched under *Chimel* is that area from which the arrestee *might* gain possession of a weapon or destructible evidence" [emphasis original].[56] In the case *sub judice,* the room in which Davis was arrested was described as "one large open area." Thus, this case does not involve the search of a separate enclosed area. Moreover, Deputy Palmer and Trooper Payne did not have to escort Davis to the kitchen to bring the ceramic container within Davis's immediate control. According to the trial court, the container was approximately eight to ten feet from where Davis was situated. Thus, we hold that the kitchen counter was within the immediate area where Davis might have "gained possession of a weapon or destructible evidence." Pursuant to *Collins,* the constitutionality of a search incident to a lawful arrest, " 'does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found[.]' " [57] Accordingly, under the circumstances of this case, "we cannot say the search was unreasonable nor unconstitutional." [58]

Based on the foregoing reasons, the order of the McLean Circuit Court denying Davis's motion to suppress the items seized from his residence is affirmed.

ALL CONCUR.

searched is 'within (the arrestee's) immediate control construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' "

**52.** *Watkins,* 564 F.2d at 203.

**53.** *Id.*

**54.** *Id.* at 204–05.

**55.** *Id.*

**56.** *Collins,* 574 S.W.2d at 298.

**57.** *Id.* (quoting *Robinson,* 414 U.S. at 235, 94 S.Ct. 467).

**58.** *Id.* at 298.