**Barry KERR, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000247–MR.

Supreme Court of Kentucky.

June 20, 2013.

Emily Holt Rhorer, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Todd Dryden Ferguson, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

Barry Kerr appeals as a matter of right [1] his convictions for first-degree trafficking in a controlled substance, second offense; second-degree trafficking in a controlled substance; and being a first-degree Persistent Felony Offender (PFO 1). He raises the following issues on appeal:

1) he is entitled to retroactive application of House Bill 463;

---

**1.** Ky. Const. § 110(2)(b).

2) his sentence of fifty years' imprisonment constitutes cruel and unusual punishment;

3) the trial court erroneously denied his motion to suppress evidence uncovered in an illegal search;

4) the trial court erroneously admitted prior-bad-acts evidence and hearsay evidence;

5) the prosecutor's closing argument constituted misconduct; and

6) the jury recommended sentences enhanced by the PFO statute without first fixing sentences for the underlying charges.

Kerr's convictions and sentences must be reversed because the trial court erroneously admitted hearsay evidence. Because we reverse, we need address only the issues likely to recur upon retrial.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Kerr had two outstanding arrest warrants at the time Kentucky State Police received an anonymous tip that he was trafficking pills out of a guest room at the Pinehurst Lodge. Only one guest room in the lodge was being rented at the time,[2] so Lieutenant Irvin and Detective Wesley set up surveillance of the rented room from an unoccupied neighboring room.

For the first hour of surveillance, the officers observed no activity in or out of the room. Within the next hour, a vehicle in which Kerr was a passenger pulled up to the rear door of the rented room. Kerr exited the vehicle carrying a blue duffel bag and entered the rented room.

About an hour and a half later, another car containing three people parked at the rear of the lodge.[3] Two of the people entered the rented room and stayed for ten to twelve minutes before the trio left the lodge. About an hour later, the same car returned with three people, two of whom had visited the rented room earlier. Those two again went into the rented room and stayed for ten to twelve minutes before all three visitors left the lodge. Lieutenant Irvin and Detective Wesley unsuccessfully attempted to arrange for other officers to stop the car both times it left the lodge.

After two to three hours passed without further traffic,[4] Lieutenant Irvin and Detective Wesley, with assistance from other officers, decided to make contact with the occupant of the rented room. Kerr opened the door to the officers' knock, and the officers discovered that Stephanie Sharp was also present in the room. The officers immediately arrested Kerr. Located in the floor of the bedroom was the blue duffel bag that Kerr was seen carrying earlier. It was unzipped, and the officers could see large pill bottles—like those used commercially in pharmacies—and plastic baggies with pills in them. The bag also contained three empty pill bottles.

In addition to the pills, officers discovered $1,269.00 in cash in the pocket of Kerr's trousers, which were hanging on the back of the bedroom door. They found a crack pipe under the mattress. And they found a rolled up dollar bill with white powder residue, digital scales, a knife with white powder residue, and a box of plastic sandwich baggies.

---

2. The room was rented under the name of Stephanie Sharp.

3. The officers recognized all three of the people and identified them at trial by name.

4. Both officers thought that another car drove up later in the evening; but they had no details of it, and it was not reported in the police report.

The grand jury indicted Kerr, charging him with (1) one count of first-degree trafficking in a controlled substance (oxycodone), second or subsequent offense; (2) two counts of second-degree trafficking in a controlled substance (hydrocodone and alprazolam); (3) one count of possession of drug paraphernalia, second or subsequent offense; and (4) with being a PFO 1.

At trial, the trial court granted a directed verdict of acquittal on the charge of trafficking in alprazolam. And the jury found Kerr guilty of (1) first-degree trafficking in a controlled substance, second offense; (2) second-degree trafficking in a controlled substance; and (3) being a PFO 1. The jury acquitted Kerr of possession of drug paraphernalia. The jury recommended a sentence of fifty years' imprisonment for first-degree trafficking in a controlled substance, second offense, as enhanced by being a PFO 1; and a sentence of twenty years' imprisonment for second-degree trafficking in a controlled substance as enhanced by being a PFO 1, with the sentences to be served concurrently. The trial court sentenced Kerr in accordance with the jury's recommendation.

## II. ANALYSIS.

### A. Evidentiary Errors.

Before the prosecution began its case on the first day of trial, Kerr moved the court in limine to exclude two areas of evidence: (1) that police received an anonymous tip that Kerr was trafficking drugs out of a guest room at the Pinehurst Lodge, and (2) that the police had outstanding arrest warrants for Kerr. Kerr argued that the anonymous tip was hearsay and that the arrest warrants were unduly prejudicial and would be used by the jury as propensity evidence. Kerr wanted the trial court to limit the jury's information to knowing only that the police were at the lodge

conducting surveillance, the police knocked on Kerr's door, and immediately arrested him.

The Commonwealth argued that the jury needed more information to understand what was happening at the lodge leading up to Kerr's arrest. The Commonwealth argued that the anonymous tip would not be presented as substantive evidence but to explain why the police were monitoring Kerr. The trial court ruled that it would allow testimony that the police had arrest warrants for Kerr—but not the crimes underlying the warrants—and would admonish the jury in order to limit prejudice to Kerr. The Commonwealth then agreed that it would not offer evidence of the anonymous tip. Ultimately, evidence of both the arrest warrants and the anonymous tip was introduced at trial under circumstances discussed below.

Kerr argues that the existence of the arrest warrants and the tip that he was trafficking pills out of the lodge are irrelevant, more prejudicial than probative under Kentucky Rules of Evidence (KRE) 403, and prohibited prior-bad-acts evidence. He also contends the anonymous tip evidence is inadmissible hearsay. We will review the arrest warrant and anonymous tip evidence separately because they implicate distinct evidentiary rules. Upon review, we hold that the trial court erred in allowing testimony of the anonymous tip but did not err in allowing testimony of the arrest warrants.

### 1. The Trial Court Abused its Discretion in Admitting the Anonymous Tip Evidence, and the Error was not Harmless.

Detective Wesley was the Commonwealth's first witness. He testified that the police did not charge Sharp because there was no traffic in or out of the guest

room before Kerr's arrival and Sharp did not have any drugs, money, or contraband on her person at the time of arrest. On cross-examination, Kerr's line of questioning explored why the officers charged Kerr with drug trafficking but did not charge Sharp or the other people observed visiting the guest room. He asked the detective why the people who visited Kerr's guest room were not charged if the police believed they were buying pills. The detective responded that it "would be an assumption that those people were trafficking pills. I have no proof of it." Kerr then asked why it was not an assumption that Kerr was trafficking pills if it would be an assumption that the people visiting the room were trafficking.

At that point, a bench conference ensued at which the trial court agreed with the Commonwealth that Kerr had just opened the door for Detective Wesley to respond that it was not an assumption that the room occupants were trafficking because of the anonymous tip implicating Kerr. When Kerr offered to withdraw the question, the trial court said that the witness should be allowed to answer because the question had been raised before the jury. Detective Wesley then proceeded with testimony to the effect that the reason for the surveillance mission at Pinehurst Lodge was the arrest warrants for Kerr and an anonymous tip that Kerr was trafficking in controlled substances at the lodge.

Lieutenant Irvin also testified that the police did not arrest Sharp because she did not have any contraband on her or in her purse, nor had they received any information that Sharp was doing "bad stuff" out of the room.

The Commonwealth later emphasized the significance of this anonymous-tip testimony in its closing argument to the jury. Kerr contends the trial court should have excluded the anonymous tip as irrelevant hearsay.[5]

We have acknowledged that "information as to the motivation of police officers for actions they have taken may be needed to avoid misleading the jury."[6] But "receipt of such information is fraught with danger of transgressing the purpose underlying the hearsay rule."[7] An officer should not be allowed to relate unlimited "historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great."[8]

In *Gordon v. Commonwealth*,[9] we described the fine line between the type of legitimate evidence that may be admitted to avoid misleading the jury and the type of illegitimate hearsay evidence that only purports to do so. We held that testimony explaining why a defendant had become a suspect in a drug investigation is relevant to avoid any implication that the defendant was unfairly singled out in the drug sting operation and to explain why the defendant was targeted. "[A]n arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be al-

---

5. To the extent that Kerr argues that the anonymous tip evidence was inadmissible under KRE 404(b), we note that the anonymous tip was not evidence of other crimes or bad acts. The tip concerned the very crime for which Kerr was on trial. So analysis under KRE 404(b) is inappropriate. This is a pure hearsay issue.

6. *Gordon v. Commonwealth*, 916 S.W.2d 176, 178 (Ky.1995).

7. *Id.*

8. *Id.* at 179.

9. *Id.* at 178.

lowed some explanation of his presence and conduct." [10] It should be sufficient for an officer to testify that he acted " 'upon information received' or words to that effect[.]" [11] So, in *Gordon*, "it was not improper to admit evidence that appellant had become a suspect in the county-wide drug investigation. This avoided any implication that appellant had been unfairly singled out and explained why the police equipped an informant with a recording device and money with which to attempt a drug buy from appellant." [12]

But "[t]here was no legitimate need to say or imply that [Gordon] was a drug dealer or that he was suspected by the police department of selling drugs in a particular vicinity." [13] This crossed the line into inadmissible hearsay, which we held was "utterly unnecessary and unfairly prejudicial.... Admission of this evidence branded [Gordon] a drug dealer, violated his right to confront and cross-examine witnesses, [and] denied his right to be tried only for the crime charged...." [14]

As in *Gordon*, it would have been proper for Detective Wesley to testify that Kerr had become a suspect in a drug investigation. This would have avoided Kerr's at-tempts to suggest that he had been unfairly singled out for prosecution. It also would have explained, at least partially, why officers pursued Kerr more rigorously than the visitors to Kerr's room. But there was no legitimate need to inform the jury of the anonymous tip that Kerr was dealing drugs out of the Pinehurst Lodge. [15] This was inadmissible hearsay.

■ We reject the Commonwealth's contention that the anonymous tip testimony was not hearsay because it was offered to show the officers' motivation in arresting Kerr, not to prove the truth that Kerr was trafficking. Extrajudicial statements to a police officer are inadmissible hearsay unless offered to explain the basis for the action later taken by the police officer. [16]

The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case. Such information is then admissible, not to prove the facts told to the police officer, but only to prove why the police officer then acted as he did. It is admissible *only if there* is an issue about the police officer's action. [17]

10. *Id.* (citation omitted).

11. *Id.* (citation omitted).

12. *Id.* at 179.

13. *Id.*

14. *Id.* We, likewise, stated in *Peyton v. Commonwealth*, 253 S.W.3d 504 (Ky.2008), that an officer's testimony that a defendant was a target in a drug investigation was "generally admissible under KRE 404(b)(2) because it would be difficult to explain why [Peyton] was being targeted for a drug sting operation without providing some background information." *Id.* at 516. But the officer "should not have stated that he believed [Peyton] was a drug dealer...." *Id.*

15. Lieutenant Irvin testified that they did not arrest Sharp in connection with the case be-cause, unlike Kerr, law enforcement had no tips that she was doing "bad stuff" out of the room. This testimony would have been sufficient to show the officers' motivation in arresting Kerr and not Sharp without branding Kerr a drug dealer.

16. *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky.1988). "This Court accepted the plurality holding of *Sanborn* regarding investigative hearsay and the verbal acts doctrine in *Brewer v. Commonwealth*, 206 S.W.3d 343, 351 (Ky.[ ]2006), therefore rendering it binding precedent." *Chestnut v. Commonwealth*, 250 S.W.3d 288, 294 (Ky.2008).

17. *Sanborn*, 754 S.W.2d at 541 (emphasis in original).

The Commonwealth argues that Kerr's defense that Sharp was the one trafficking pills out of the guest room while he was unfairly singled out for the crime placed the officers' motivation for arresting Kerr at issue. So, as the Commonwealth's argument goes, the anonymous tip that Kerr was trafficking drugs is not hearsay because it was offered to explain the officers' motivations.

■ We disagree with the Commonwealth. The anonymous tip was hearsay evidence because it was used, at least in part, to prove the truth of the matter asserted—that the police arrested Kerr because he was trafficking drugs.[18] The hearsay purposes of the anonymous tip evidence cannot be separated from its non-hearsay purposes. The police arrested Kerr because they received a tip that he was trafficking, and other evidence supported this tip as true. The anonymous tip reflected directly on Kerr's guilt of the charged offense.[19]

■ We also cannot say that Kerr's cross-examination of Detective Wesley invited the error or opened the door to the anonymous tip testimony. Kerr asked why it would be an assumption that the people visiting the guest room were selling pills, but it was not an assumption that Kerr was trafficking pills. If anything, this question invited an answer from Detective Wesley that the officers could only assume that the visitors were trafficking in drugs because they did not possess enough proof otherwise. Despite their efforts, the police were unable to stop and search the vehicle after it left the lodge. It is safe to say that the officers would not have arrested and charged Kerr with trafficking based only on their observations of the activity outside the guest room. Rather, they charged Kerr with trafficking because they had arrest warrants for him, which led to the discovery of a large quantity of controlled substances; and before arresting him, they observed activity common to trafficking.

■ The erroneously admitted anonymous-tip evidence was not harmless. Contrary to the dissent's assertion on this point, "Our inquiry is not simply 'whether there [is] enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.' "[20]

---

18. We note that Kerr's case is distinguishable from *Chestnut*, 250 S.W.3d at 293–95 (Ky. 2008). There, Chestnut objected to testimony that after police stopped Chestnut's car in the vicinity of the burglary, the officers conducted a "show-up" identification to see if a witness could identify him. The officers testified that they arrested Chestnut following the "show-up." This Court determined that why the police arrested Chestnut was at issue because Chestnut claimed at trial that he was never in the neighborhood where the burglary occurred, and he accused the police of lying. And we held that the testimony regarding the testimony of Chestnut's identification was offered to prove the motive of the police for arresting him. But we noted that the officers' testimony "concerned only what they did on the night in question, not that [the witness] identified [Chestnut]." *Id.* at 295. Here, De-

tective Wesley did not limit his testimony to his actions on the night in question but testified about out-of-court statements made by an anonymous person.

19. *See Hughes v. Commonwealth*, 730 S.W.2d 934, 935 (Ky.1987) (reversing for admission of hearsay in the form of an anonymous tip because it reflected upon the defendant's guilt).

20. *Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky.2013) (quoting *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky.2009)). Contrary to the dissent's claim, a conviction cannot be upheld under the harmless error standard simply because sufficient evidence existed to convict the defendant absent the evidence erroneously admitted.

■ Here, it appears likely that the anonymous-tip evidence substantially influenced Kerr's conviction. While Detective Wesley's and Lieutenant Irvin's testimony regarding the tip was brief, the Commonwealth's use of the anonymous-tip evidence during its closing argument was anything but brief. The prosecutor discussed more than once that it was an "uncontroverted fact" that the police received a tip that Kerr was selling pills out of a room at the Pinehurst Lodge. And when discussing why the officers chose to arrest Kerr and not Sharp, the prosecutor explained to the jury in closing argument that the police had not received a tip that Sharp was doing anything bad out of the guest room like Kerr was. The prosecutor argued:

> When they go in and act on that information, lo and behold, where Kerr is they find [contraband]. Does it make more sense to you that Ms. Sharp ... was selling pills ... or that it was Mr. Kerr who they had received a complaint [about]?

Given the extent to which the prosecutor focused on the anonymous tip in his closing argument, we cannot say that the inadmissible hearsay evidence did not substantially influence Kerr's conviction. Kerr's convictions and sentences must be reversed in light of this evidentiary error. As for Kerr's other claimed errors, we address only those likely to recur in the event of a retrial.

**2. The Trial Court did not Abuse its Discretion in Admitting the Arrest–Warrant Evidence.**

As discussed, the trial court denied Kerr's motion in limine to exclude evidence that the police had two arrest warrants for Kerr that were unrelated to the drug charges being tried. At trial, Detective Wesley testified on direct that the officers had arrest warrants for Kerr. The prosecutor also mentioned the arrest warrants in his closing argument. We address this issue because it is likely to recur upon remand.

**a. The arrest-warrant evidence was relevant.**

Kerr argues that the existence of the arrest warrants is irrelevant because the evidence was not required to present the Commonwealth's case. He contends the officers should have limited their testimony to relate only that they conducted surveillance (without mentioning why), knocked on the door to Kerr's guest room, and immediately arrested him.

■ We give substantial deference to a trial court's relevancy decisions.[21] And "we will not disturb the decisions of the trial court without a clear showing of abuse of discretion."[22] Here, the trial court determined that the existence of the arrest warrants for Kerr was relevant to the reason why the police were observing Kerr's guest room. We cannot say that the trial court's decision is a clear abuse of discretion.

"Evidence which is not relevant is not admissible."[23] " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[24] To avoid leaving "triers of fact with mere fragments of information[,] ... relevant evidence is and must be viewed as includ-

---

21. *Webb v. Commonwealth,* 387 S.W.3d 319, 325 (Ky.2012).

22. *Id.* (citation omitted).

23. KRE 402.

24. KRE 401.

ing evidentiary facts needed to portray the general nature and character of litigation, what the drafters of the Federal rules described as 'background.' " [25]

■ Here, the arrest-warrant evidence was relevant to the context of the investigation—why the police were observing Kerr's guest room—and how the crime came to be discovered. The surveillance lasted six hours and took place from a guest room next to Kerr's. After witnessing individuals visit Kerr's room twice and stay for a period of ten to twelve minutes each time, the police decided to make contact with Kerr. When Kerr opened the door, the police immediately placed him under arrest.

Knowledge of the arrest warrants was necessary for the jury to understand why the police set up the extensive surveillance and then arrested Kerr with only highly circumstantial proof of criminal activity. Without knowing of the arrest warrants, the jury would have been left to wonder about the legitimacy of the officers' actions in placing Kerr on the floor and arresting him with such scant evidence of wrongdoing.[26] So we hold that the trial court did not abuse its discretion in ruling that the arrest warrants were necessary to an adequate understanding of the context of the officers' conduct.

### b. The arrest-warrant evidence was not prohibited under KRE 404(b).

Kerr next argues that the trial court should have excluded evidence concerning the arrest warrants as impermissible prior-bad-acts evidence. Under KRE 404(b),

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

■ "[T]rial courts must apply [KRE 404(b) ] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." [27] To determine whether evidence of prior bad acts is admissible, we must decide if the evidence is relevant "for some purpose other than to prove the criminal disposition of the accused[,]" [28] probative as to the actual commission of the prior bad act, and not overly prejudicial under KRE 403.[29]

---

25. The Kentucky Evidence Law Handbook Ch. 2 § 2.05(3) (Robert G. Lawson, 4th ed.2003) (citing 2 Weinstein's Federal Evidence § 401.04(f)(a) (2d ed.2002) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.")).

26. Contrary to the dissent's objection, we do not suggest that insufficient evidence existed to support Kerr's convictions. We mean only to say that *at the time* the officers arrested Kerr, they only had circumstantial proof of

drug trafficking. This scant evidence would not have justified Kerr's arrest. That is why the jury was entitled to know that the officers initially arrested Kerr on the outstanding arrest warrants.

27. *Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky.1994).

28. *Meece v. Commonwealth,* 348 S.W.3d 627, 662 (Ky.2011)

29. *King v. Commonwealth,* 276 S.W.3d 270, 275 (Ky.2009).

The standard of review for a trial court's evidentiary ruling is abuse of discretion.[30]

The trial court did not abuse its discretion in admitting the prior-bad-acts evidence because it falls under the exception found in KRE 404(b)(2), *i.e.*, the existence of the arrest warrants was inextricably intertwined with the police surveillance of the Pinehurst Lodge and with Kerr's initial arrest. "KRE 404(b)(2) allows the Commonwealth to present a complete, unfragmented picture of the crime and investigation[,]"[31] including a "picture of the circumstances surrounding how the crime was discovered."[32]

In *Clark v. Commonwealth*,[33] Clark was on trial for twenty-five felony sexual offenses against his biological children and his live-in girlfriend's son. The trial court permitted the mother of the minor victims to testify that she did not immediately confront Clark upon discovering the abuse because he had physically assaulted her in the past and she was afraid of him. This Court upheld the trial court's ruling because

> the setting and context of the events surrounding [the mother's] discovery of the sexual abuse of her children, and her reasons for not contemporaneously confronting Appellant about it, were germane to the overall sequence of events surrounding the crimes and to the

events which led to them being reported to authorities. As such, this evidence was inextricably intertwined with other evidence critical to the case.[34]

We also find federal case law on this issue persuasive. Although the Federal Rules of Evidence (FRE) 404 does not specifically provide for the admission of evidence of prior bad acts that are inextricably intertwined with other evidence essential to the case, "[e]very circuit now applies some formulation of the inextricably intertwined 'test.'"[35] This exception to the general exclusionary rule allows for the introduction of prior bad acts when relevant to providing context to the crime being tried because

> the acts that constitute crimes cannot be understood without at least some reference to acts, events, or conditions that lead up to them ... even though not inherent in or necessary to the crime.... [W]itnesses cannot convey what they know to the trier of fact without making at least some reference to acts, events, or conditions that are a natural part of a narrative without referring to at least some things that are not essential in proving the crime itself.... Hence[,] it becomes reasonable to speak of a "complete story" rule[;] and the system allows proof of what amounts to uncharged crimes[ ] when these are nec-

---

30. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky.2000).

31. *Adkins v. Commonwealth,* 96 S.W.3d 779, 793 (Ky.2003) (holding that the defendant's incarceration at the time of his confession was admissible evidence to show the setting and context of the events surrounding the confession and explain any delays in his return to Kentucky) (citing Robert G. Lawson, KENTUCKY EVIDENCE LAW HANDBOOK § 2.25 at 96 (3d ed. Michie 1993)); *see also Norton v. Commonwealth,* 890 S.W.2d 632, 638 (Ky. App.1994) (citations omitted) (KRE 404(b)(2) is "intended to be flexible enough to permit

the prosecution to present a complete, unfragmented, unartificial picture of the crime committed by the defendant, including necessary context, background and perspective.").

32. *Clark v. Commonwealth,* 267 S.W.3d 668, 681 (Ky.2008) (citations omitted).

33. *Id.*

34. *Id.* (citing KRE 404(b)(2)).

35. *United States v. Bowie,* 232 F.3d 923, 927 (D.C.Cir.2000) (citations omitted).

essary in telling and understanding the story of the charged crimes.[36]

We find the case *United States v. LaDue*,[37] particularly informative. In that case, LaDue was convicted of being a felon in possession of a firearm. Police received a call from LaDue's ex-brother-in-law because an intoxicated LaDue was beating on his door in the middle of the night. An officer was scanning the area for LaDue (who fled before the police arrived), when the officer received a report of "shots fired." When the officer responded to the call, he found LaDue. LaDue challenged the relevancy of the officer's testimony that he was responding to a report of "shots fired." "According to LaDue, the district court should have instructed [the officer] to testify simply that he had received a report of a disturbance, without mentioning gunfire."[38] The Court held that the district court did not abuse its discretion in finding the officer's testimony relevant because

> [a] jury is entitled to know the circumstances and background of a criminal charge. . . . That the report concerned "shots fired" provided the jury with the

proper context in which to understand [the officer's] actions. It helped to explain [the officer's] decision to leave his patrol car and pursue an unidentified man running across the street, and his decision to draw his service weapon. Without an understanding of the serious nature of the call to which [the officer] was responding, the jury could have been confused or misled by a seeming overreaction to a routine disturbance call.[39]

Federal courts recognize that a jury "cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge."[40] And where the police suspect a defendant of committing a different crime that led to the charges being tried, the evidence of the other bad act is often admitted at trial to furnish context to the jury.[41]

■ The existence of the arrest warrants here was necessary to an adequate understanding of the context of the officers' conduct—it provided the setting and context of the events surrounding the offi-

---

36. 1 FEDERAL EVIDENCE Ch. 4 § 4:33 (Christopher B. Mueller and Laird C. Kirkpatrick 3d ed.) (citations omitted). *See also United States v. Senffner*, 280 F.3d 755, 764 (7th Cir.2002) ("[U]nder the inextricably intertwined doctrine, . . . acts 'concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of 'other acts' within the meaning of Fed.R.Evid. 404(b). . . .' Acts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime.") (citations omitted).

37. 561 F.3d 855, 857–58 (8th Cir.2009).

38. *Id.* at 857.

39. *Id.* at 857–58 (citations and internal quotations omitted).

40. *United States v. Moore*, 735 F.2d 289, 292 (8th Cir.1984) (citation omitted) (holding that the trial court did not err by "letting the government establish that [the defendant] had been arrested in the course of a drug raid" because it established the context in which the defendant was arrested).

41. *See, e.g., United States v. Gorman*, 312 F.3d 1159, 1162 (10th Cir.2002) (holding that where the smell of marijuana led to a search that uncovered a firearm, evidence relating to the marijuana was "intertwined with the discovery of the firearm and therefore necessary to understand the flow of events and put police conduct in context").

cers' surveillance of Kerr's guest room. And, as in *Clark*, the evidence provided the setting and context of the discovery of the crime. Excluding the reason why police were observing Kerr and why they arrested him, thereby gaining access to the contraband, would have left the jury with an incomplete and fragmented picture of the circumstances surrounding how the drug trafficking was discovered.[42] And, as discussed above, it would have left the jury with an unfounded doubt regarding the legitimacy of Kerr's initial arrest.[43] The purpose of the arrest-warrant evidence was "to complete a picture by providing context and meaning for the central events, not to paint other pictures of criminality or misbehavior."[44]

So we hold that the arrest-warrant evidence is inextricably intertwined with the charged crimes because it was relevant to the context of the police surveillance, Kerr's arrest, and discovery of the crime.[45]

### c. The arrest-warrant evidence need not have been excluded under KRE 403.

Kerr further argues that even if the arrest-warrant evidence was relevant and admissible under KRE 404(b), the evidence should have been excluded because its probative value was substantially outweighed by the danger of undue prejudice. Kerr claims that the evidence was highly prejudicial because the warrants indicate that Kerr committed crimes in the past and was eluding the law.

KRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." This rule "gives the trial judge substantial discretion to balance probative worth against harmful effects. The trial court is the most familiar with the facts of the case, and thus in the best position to make the determination of admissibility."[46] We cannot say the trial court abused its substantial discretion when admitting the arrest-warrant evidence.

 Significantly, the trial court prohibited in limine any evidence of the underlying offenses on which the arrest warrants were based. This substantially

---

**42.** See also *Workman v. Commonwealth*, 2006–SC–000399–MR, 2007 WL 4139638 (Ky. Nov. 21, 2007) (citation omitted) ("When presenting 'a complete, unfragmented picture of the crime and investigation,' it is customary and necessary to explain how the crime was discovered and reported to authorities.").

**43.** "Sometimes the justification for proving other crimes is that such proof explains how law enforcement officers uncovered the charged crime, or how they came to the conclusion to bring charges against the defendant. In this setting, proving uncharged offenses can only be justified if some real issue arises that relates to police misconduct, and issues of this sort enter the case only if raised by way of defenses.... [W]here such issues are raised in the trial itself, in an apparent bid to prove police misconduct or improper motive, proof of prior uncharged misconduct

may be important evidence that helps answer or refute such charges." 1 FEDERAL EVIDENCE Ch. 4 § 4:33 (citations omitted).

**44.** *Id.*

**45.** See *Burgess–Smith v. Com.*, 2010–CA–002284–MR, 2012 WL 3136773 (Ky.App. Aug. 3, 2012) (holding that evidence of an arrest warrant was inextricably intertwined with the charged crimes because it was "[inextricably] intertwined with the reasons for the police officers' actions in patting down Burgess–Smith for weapons and securing him, and offers an explanation why the officers so fervently pursued Burgess–Smith during his repeated attempts to escape").

**46.** *Webb*, 387 S.W.3d at 329 (citation omitted).

limited the prejudice to Kerr. So this case is distinguishable from cases in which we reversed convictions where the trial court admitted evidence of the existence of the defendant's arrest warrants and the crimes underlying the warrants.[47] And the probative value of the evidence was great under the facts of this case.

Although the trial court did not err by admitting evidence of the arrest warrants, we recognize the risk that the jury might consider the arrest-warrant evidence as propensity evidence. Had Kerr requested the jury be admonished to use the evidence only as context for why the police were watching Kerr and the reason for his initial arrest, he would have been entitled to it.[48]

The trial court here indicated that it would admonish the jury not to use the existence of the arrest warrants as proof of Kerr's guilt in this case. Unfortunately, the trial court failed to give that admonition when the arrest-warrant evidence was admitted. But the onus was on Kerr to request the admonition at the time of the objectionable testimony. So Kerr is entitled to relief only if the arrest-warrant evidence was "so likely to be misapplied by the jury that an admonishment would clearly have been futile, and then only if the remarks were so prejudicial as clearly to have affected the result."[49] Here, an admonition would not have been futile. The risk of prejudice arising from evidence of the arrest warrants would have been diminished by a proper admonition from the trial court.

The trial court did not abuse its discretion in admitting the arrest-warrant evidence even without a corresponding admonition to the jury.

## B. The Search of the Guest Bedroom was Legal.

The Fourth Amendment of the U.S. Constitution, applicable to the states through the Fourteenth Amendment, and Section 10 of the Kentucky Constitution provide safeguards against unreasonable searches and seizures. Based on these constitutional provisions, Kerr moved under the U.S. and Kentucky Constitutions to suppress the contents of the duffle bag, claiming the items were discovered during an illegal search of the guest room.[50] Af-

47. Our predecessor court reversed a conviction for carrying a concealed deadly weapon discovered during service of an arrest warrant because the trial court admitted evidence that the warrant was for a charge of bank burglary. *Scamahorne v. Commonwealth*, 357 S.W.2d 30 (Ky.1962). Likewise, in *Metcalf v. Commonwealth*, 158 S.W.3d 740 (Ky.2005), the Court reversed a conviction because officers testified that they went to Metcalfs residence to investigate an allegation that he had videotaped a minor undressing. There, the Court specifically said that "[i]t would have been a simple matter for [the officers] to truthfully testify that they came to [Metcalf's] residence to investigate an allegation of child abuse without mentioning the uncharged videotaping incident." *Id.* at 744.

48. KRE 105 ("When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly."). *See also Lanham v. Commonwealth*, 171 S.W.3d 14, 27 (Ky.2005) (requiring a limiting admonition where requested by the defendant because the introduction of comments that a defendant is lying made by police during a recorded interview entails the possibility that the jury will misunderstand and accord to those comments an impermissible weight during deliberation).

49. *Walker v. Commonwealth*, 349 S.W.3d 307, 312 (Ky.2011).

50. The other illicit items and contraband located in the room are not at issue. They were located after Sharp signed a consent-to-search form.

ter a suppression hearing on the matter, the trial court denied Kerr's motion. We address the trial court's ruling on this matter because it would remain an issue upon remand. We agree with the trial court's decision that the search of Kerr's guest room was legal.

Lieutenant Irvin was the only witness at the suppression hearing. Based on her testimony, the trial court made the following factual findings.

1) The Jamestown Police Department received information that Kerr was selling pills out of a room at the Pinehurst Lodge;

2) There were also outstanding arrest warrants for Kerr;

3) Lieutenant Irvin and another officer conducted surveillance of the guest room where Kerr was located before executing the arrest warrants;

4) After some time, the officers approached the door of Kerr's room and announced themselves;

5) When Kerr opened the door, the officers placed him and Stephanie Sharp on the floor near the entrance to a bedroom;

6) The officers then conducted a sweep of the bedroom;

7) Sharp also consented to a search; and

8) Officers viewed an unzipped duffel bag in the bedroom and were able to observe several items of pills and other drugs in the bag.

Based on these factual findings, the trial court concluded that the search leading to discovery of the controlled substances was lawful under three exceptions to the warrant requirement, including (1) search incident to arrest, (2) plain view, and (3) protective sweep.[51]

■■■ The standard of review for a trial court's ruling on a suppression motion is two-fold. The trial court's factual findings are reviewed for clear error and are deemed conclusive if supported by substantial evidence.[52] And the trial court's application of the law to the facts found is reviewed de novo.[53]

The trial court's factual findings in this case are not in dispute and are clearly supported by substantial evidence. The only question is whether under these facts the search of the guest bedroom was lawful.

■■■ When a search is conducted without a warrant, "[t]he Commonwealth carries the burden to demonstrate that the warrantless entry falls within a recognized exception to the warrant requirement."[54] We hold that the Commonwealth has met its burden to show the search was lawful under the protective-sweep and plain-view exceptions to the warrant requirement. So we affirm the trial court's denial of Kerr's motion to suppress.[55]

---

**51.** The trial court also noted that the officers had consent to search the room. The trial court's factual findings regarding when Sharp gave consent are ambiguous. But Lieutenant Irvin testified that she received Sharp's consent after the officers viewed the illegal substances in the duffel bag. So the legality of the initial search cannot be based on Sharp's after-the-fact consent.

**52.** *Bauder v. Commonwealth*, 299 S.W.3d 588, 591 (Ky.2009) (citations omitted); Kentucky Rules of Criminal Procedure (RCr) 9.78.

**53.** *Commonwealth v. Kelly*, 180 S.W.3d 474, 476–77 (Ky.2005) (citations omitted).

**54.** *King v. Commonwealth*, 386 S.W.3d 119, 122 (Ky.2012) (citations omitted).

**55.** Because we find the search lawful for other reasons, we need not address the trial court's ruling that the search satisfied the search-incident-to-arrest exception.

Kerr does not question the officers' authority to enter his guest room in order to effectuate his arrest under the valid arrest warrants. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." [56]

Kerr also does not contest the fact that once the officers were in the bedroom of his guest suite, the controlled substances within the duffel bag were in plain view. The plain-view exception to the warrant requirement applies when the object seized is plainly visible, the officer is lawfully in a position to view the object, and the incriminating nature of the object is immediately apparent.[57] The controlled substances were not in the officers' plain view until after they arrested Kerr and searched the bedroom. So the question here is whether the officers were lawfully in the bedroom, i.e., whether the intrusion that brought the officers into plain view of the controlled substances is supported by a recognized exception to the warrant requirement.[58]

We hold that the officers were permitted to conduct a protective sweep of the bedroom in which the duffel bag of controlled substances was located. "[L]aw enforcement officers may conduct a protective sweep for their own safety." [59] "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." [60]

In *Maryland v. Buie*,[61] the Supreme Court identified two types of protective sweeps incident to an arrest that are reasonable and lawful under the Fourth Amendment. The first type of protective sweep incident to an arrest allows officers, "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." [62]

The second type of protective sweep incident to an arrest allows officers to undertake a broader search of places not adjacent to the place of arrest if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." [63]

---

56. *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

57. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (citations omitted).

58. "Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." *Id.* at 135, 110 S.Ct. 2301.

59. *Guzman v. Commonwealth*, 375 S.W.3d 805, 807 (Ky.2012).

60. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

61. *Id.*

62. *Id.* at 334, 110 S.Ct. 1093.

63. *Id.* These two types of protective sweeps are distinct from the search-incident-to-arrest exception to the warrant requirement. A search incident to arrest consists of "a search of the arrestee's person and the area 'within his immediate control'-construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S.

So when police make a valid arrest, they may conduct a protective sweep of areas adjoining the place of arrest from which an attack may be made even without probable cause or reasonable suspicion of the presence of dangerous individuals. Police may also conduct a broader protective sweep of areas not adjoining the place of arrest if supported by articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.[64]

The Commonwealth does not contend that the officers here undertook a protective sweep because they reasonably believed the area harbored dangerous individuals. Rather, the Commonwealth argues[65] that the officers' search of Kerr's guest bedroom falls under the first category of protective sweeps. We agree.

In order for a search to be lawful under the first category of the protective-sweep exception to the warrant requirement, the area searched must be adjoining the place of arrest from which an attack may be made, and the search must be cursory, consisting of only a visual inspection of those places in which a person might be hiding.[66]

The guest bedroom where the search was conducted adjoined the place of Kerr's arrest. The trial court found that the officers placed Kerr and Sharp on the floor near the entrance to the bedroom that was searched. This finding was based on Lieutenant Irvin's explanation of the guest room's layout at the suppression hearing. The door through which the officers entered opened up into a hallway. A couple of paces down the hallway and to

752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *see also Collins v. Commonwealth*, 574 S.W.2d 296, 298 (Ky.1978) ("[T]he area which may be searched under *Chimel* is that area from which the arrestee [m]ight gain possession of a weapon or destructible evidence."). The "justification for the search incident to arrest ... [i]s the threat posed by the arrestee," while the justification for a protective sweep is "the safety threat posed by the house, or more properly by unseen third parties in the house." *Buie*, 494 U.S. at 336, 110 S.Ct. 1093. For this reason, it matters not to our analysis that Kerr was placed on the floor and might have already been handcuffed when the officers conducted a protective sweep of the bedroom.

**64.** *Id. See also* 68 Am.Jur.2d *Searches and Seizures* § 265 and *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir.2009). Recently, this Court expressly recognized the Supreme Court's analysis of the protective sweep set forth in *Buie. Guzman*, 375 S.W.3d at 807. Kerr mostly cites case law rendered before the Supreme Court's 1990 decision in *Buie*, with one exception. Kerr refers us to a Kentucky Court of Appeals decision, *Davis v. Commonwealth*, 120 S.W.3d 185 (Ky.App.

2003), in which the court applied Kentucky's earlier standard for protective sweeps as stated in *Commonwealth v. Elliott*, 714 S.W.2d 494, 496 (Ky.App.1986). In *Elliott*, the Court of Appeals concluded that the "protective sweep" exception to the warrant requirement requires a "serious and demonstrable potentiality for danger." But neither *Davis* nor *Elliott* concern the type of protective sweep at issue here.

**65.** We use the word *argues* advisedly here because the substantive portion of the Commonwealth's legal analysis of the suppression issue totals seven sentences.

**66.** *See United States v. Lemus*, 582 F.3d 958, 964 (9th Cir.2009) ("Because the living room immediately adjoined the place of arrest and was large enough to contain an attacker, we need not reach the second prong of *Buie* and decide whether the search of the living room was justified as a 'protective sweep.' The officers were permitted to search the room 'as a precautionary matter' without either reasonable suspicion or probable cause to believe that an attacker lay in ambush.") (citation omitted).

the left was a bedroom. Across the hall from that bedroom was a bathroom. Straight ahead, the hallway ended in the common room and kitchen area.

Lieutenant Irvin testified that when the officers knocked on the door to the guest room, they could hear voices coming from the bedroom.[67] After the officers placed Kerr and Sharp on the floor in the hallway, they did a sweep of the bedroom from which the two had emerged to answer the knock. Based on the trial court's finding, as supported by the record, we conclude that the bedroom was adjoining the hallway in which the officers arrested Kerr; and an attack could easily have been launched from the bedroom.[68]

Because the bedroom adjoined the place of Kerr's arrest, the officers were entitled to conduct a cursory search consisting of only a visual inspection of those places in which a person might be hiding. The offi-

cers saw the duffel bag containing contraband sitting on the floor between the wall and the bed. This was an area in which a person could have been hiding. So the officers' visual inspection of the space between the wall and the bed was appropriate for the purposes of a protective sweep.[69] And nothing in the record indicates that the search was protracted.

The officers' conduct in searching Kerr's guest room fits cleanly within the first category of protective sweeps that are reasonable under the Fourth Amendment. In effectuating a valid arrest warrant, the officers were allowed to search the bedroom adjoining the place of Kerr's arrest. They then conducted a cursory search of places where a person could be hiding. In doing so, they observed the unzipped duffel bag full of contraband in plain view. So we affirm the trial court's denial of Kerr's motion to suppress the contraband

---

**67.** Lieutenant Irvin testified that she could tell the voices emanated from the bedroom because she could hear them coming from the other side of the window that opened into the bedroom.

**68.** *See United States v. Ford*, 56 F.3d 265, 270 (D.C.Cir.1995) ("Under *Buie's* first prong, however, as a precautionary matter and without probable cause or reasonable suspicion, [the officer] was free to look in spaces immediately adjoining the place of Ford's arrest from which an attack could be immediately launched. Because the arrest took place in the hallway, and the bedroom from which Ford emerged was immediately adjoining the hallway, [the officer] could legitimately look in the bedroom for potential attackers."); *United States v. Thomas*, 429 F.3d 282, 287–88 (D.C.Cir.2005) ("If an apartment is small enough that all of it 'immediately adjoin[s] the place of arrest' and all of it constitutes a space or spaces 'from which an attack could be immediately launched,' then the entire apartment is subject to a limited sweep of spaces where a person may be found."); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir.1995) ("*Buie* held that the police may walk through rooms adjacent to the one in which they make an arrest, to ensure that no

danger lurks within. The officers need not demonstrate any danger; they may look simply as a precaution.") (citations omitted); *United States v. Lay*, 182 F.3d 911 (4th Cir. 1999) ("[S]omeone exiting the bedroom would immediately have full view of the area of the arrest, as much or nearly as much as if the bedroom opened directly into the living room. The clear implication of the court's oral ruling is that the focus of *Buie*—the possibility of sudden violence to police officers engaged in a dangerous task in unfamiliar territory—militates against the interpretation Lay proposes for the term 'immediately adjoining area.'").

**69.** *See United States v. Lauter*, 57 F.3d 212, 217 (2d Cir.1995) ("Aside from looking in the drawer, the fruits of which search were not introduced into evidence, [the officer's] conduct was well within the scope of a permissible protective sweep, particularly in light of the small size of the apartment.... Moreover, [the officer] was justified in looking in the space between the bed and the wall, as a person certainly could have been hiding in that location.") (citation omitted).

found during the officer's protective sweep. On remand, the contraband discovered during the officers' search should not be excluded on Fourth Amendment grounds.

## III. CONCLUSION.

For the foregoing reasons, we reverse Kerr's convictions and sentences and remand for further proceedings. It is worth noting that if Kerr is convicted again upon remand, he will be entitled to the remedial penalty provisions of House Bill 463 upon his request.[70]

All sitting. ABRAMSON, KELLER, NOBLE, and VENTERS, JJ., concur.

CUNNINGHAM, J., dissents by separate opinion in which SCOTT, J., joins.

CUNNINGHAM, J., dissenting: I respectfully dissent.

First, I agree with the trial court that Appellant opened the door for the introduction of the evidence concerning the anonymous tip. Selective prosecution can be a very effective defense claim. Appellant's attorney cross-examined Detective Wesley vigorously as to why Appellant was charged with trafficking, and yet Sharp and other unknown visitors to the room were not. The truthful answer was that there had been an anonymous tip as to Appellant. In effect, that is the question Appellant asked and that is the answer Appellant got. I see no error.

Without conceding error, I cannot imagine a case where the alleged error was more harmless. Let's briefly review the evidence—other than the anonymous tip— that the jury heard.

The jury learned there were two outstanding arrest warrants against Appellant. The jury also learned that the officers proceeded to the Pinehurst Lodge where Appellant was staying. (Law enforcement only knew this because of the tip.) There, the officers did not attempt to arrest Appellant on the warrants. Instead, they set up a surveillance of his room from a neighboring room. The reason for setting up the surveillance had to be obvious to the jury. Appellant was suspected of dealing in drugs.

After about an hour, Appellant arrived in a car and went into the room carrying a blue duffel bag. No attempt to arrest him on the warrants was made. After several hours of people coming and going, the officers finally decided to go see for themselves what all the fuss was about. When Appellant opened the door, the officers saw what all the fuss was about. There, in plain view, was the duffel bag Appellant had been seen carrying into the room earlier. Now; however, it was open and the officers could see large pill bottles and plastic baggies containing pills. Also discovered in the room was over $1,200 in cash, a crack pipe, white powder residue, digital scales, a knife with white powder residue, and a box of plastic sandwich baggies.

Who needs the anonymous tip to convict Appellant of first-degree trafficking in a controlled substance? In fact, all the evidence simply affirms that the tip was truthful.

It is mystifying to me as to how the majority does not think the admission of the evidence of the existing warrants was not error, yet reverses on the introduction of the anonymous tip. Says the majority: "Here, the arrest warrant evidence was relevant to the context of the investigation—why the police were observing Kerr's guest room—and how the crime came to be discovered."

---

**70.** Kentucky Revised Statutes (KRS) 446.110.

With all due respect, this is simply not true. The police went to this motel and to this room because of the anonymous tip, not the arrest warrants. The police did not observe Appellant's room for hours after he arrived because of the arrest warrants. The arrest warrants would have simply caused the officers to arrest him on first sighting. The hours of surveillance came about because of the anonymous tip. The arrest warrants had nothing to do with it. I take strong exception to the following language in the majority's opinion.

> Knowledge of the arrest warrants was necessary for the jury to understand why the police set up the extensive surveillance and then arrested Kerr with only *highly circumstantial proof of criminal activity.* Without knowing of the arrest warrants, the jury would have been left to wonder about the legitimacy of the officers' actions in placing Kerr on the floor and arresting him with such *scant evidence of wrongdoing.*

(Emphasis added.)

I am amazed at this declaration. The "highly circumstantial proof of criminal activity" and "scant evidence of wrongdoing" was enough for the jury to be convinced of Appellant's guilt beyond a reasonable doubt and convict him and send him to prison. Apparently, from the majority's opinion, Appellant does not even argue insufficient evidence on appeal.

As previously stated, knowledge of the arrest warrants had nothing to do with the jury understanding why the police set up the surveillance. It was the anonymous tip. The anonymous tip explained a lot of things—why the officers went to the Pinehurst Lodge; why they set up the surveillance; why they did not arrest Appellant on first sighting; and why they arrested and prosecuted only Appellant and not others.

Surely, any error was harmless. Therefore, I respectfully dissent and would affirm the conviction.

SCOTT, J., joins.