RENDERED: APRIL 18, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0232-MR

ROBERT KEITH WOODALL          APPELLANT

V.        ON APPEAL FROM CALDWELL CIRCUIT COURT
HONORABLE CLARENCE A. WOODALL, III, JUDGE
NO. 97-CR-00053

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

In 1998, Robert Keith Woodall was sentenced to death for the kidnapping, rape, and murder of a teenage girl. Extensive collateral attack litigation ensued. In 2015, Woodall filed a Motion to Vacate the Death Sentence Due to Intellectual Disability, pursuant to Kentucky Rule of Civil Procedure (CR) 60.02, or in the alternative, CR 60.03. The trial court denied his motion without a hearing. This Court reversed and remanded. *See Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky. 2018). On remand, the trial court held an evidentiary hearing and again denied Woodall's motion. Woodall now appeals to this Court. For the following reasons, we affirm the order of the Caldwell Circuit Court.

# I. BACKGROUND

Robert Keith Woodall pleaded guilty to the kidnapping, rape, and murder of a teenage girl that occurred in January 1997. A jury sentencing took place in July 1998, and the jury recommended a sentence of death. The trial court adopted this recommended sentence. Extensive collateral attack litigation ensued in both state and federal court.

Eventually, Woodall filed a Motion to Vacate the Death Sentence Due to Intellectual Disability, pursuant to CR 60.02, or in the alternative, CR 60.03. He argued that he is intellectually disabled and, therefore, the imposition of the death penalty would violate his constitutional rights, as the Eighth Amendment to the United States Constitution prohibits imposition of the death penalty on those who are intellectually disabled. Woodall sought and received funding to hire an expert who submitted a report that opined Woodall is, in fact, intellectually disabled. The Commonwealth responded, and Woodall replied. The trial court then denied Woodall's motion without holding a hearing.

Woodall appealed the denial of his CR 60.02 motion to this Court. Pursuant to the United States Supreme Court's decisions in *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore v. Texas*, 581 U.S. 1 (2017), we held that Kentucky Revised Statute (KRS) 532.130(2), which defined "serious intellectual disability" for purposes of the death penalty,[1] was "simply outdated" and "potentially and

---

[1] "A defendant with significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period is referred to in KRS 532.135 and 532.140 as a defendant with a serious intellectual disability. 'Significantly subaverage general intellectual

unconstitutionally exposes intellectually disabled defendants to execution."

*Woodall*, 563 S.W.3d at 6. We further held that "any rule of law that states that

a criminal defendant automatically cannot be ruled intellectually disabled and

precluded from execution simply because he or she has an IQ of 71 or above,

even after adjustment for statistical error, is unconstitutional." *Id.* We then

sought to fashion a rule that would comport with the Constitution. We held

that a trial court's determination of whether a criminal defendant is

intellectually disabled is "akin to a totality of the circumstances test." *Id.* This

test has

> three core elements: (1) intellectual-functioning deficits (indicated
> by an IQ score approximately two standard deviations below the
> mean—*i.e.,* a score of roughly 70—adjusted for the standard error
> of measurement; (2) adaptive deficits (the inability to learn basic
> skills and adjust behavior to changing circumstances,); and (3) the
> onset of these deficits while still a minor.

*Id.* at 6–7 (quoting *Moore,* 581 U.S. at 7) (internal quotation marks omitted). We

further explained that "in addition to ascertaining intellectual disability using

this test, prevailing medical standards should always take precedence in a

court's determination." *Id.* at 7. We then reversed the trial court's order and

remanded to the trial court to conduct a hearing on Woodall's potential

intellectual disability pursuant to the guidelines we had laid out. *Id.*

    On remand, the trial court held an evidentiary hearing to determine if

Woodall had an intellectual disability that would preclude the imposition of his

---

functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below." KRS
532.130(2).

death sentence. At that hearing, Woodall presented extensive testimony from his expert, Dr. John Fabian, a Forensic and Clinical Psychologist and Neuropsychologist. Dr. Fabian opined that Woodall was intellectually disabled. Dr. Fabian's report, concluding as much, was admitted into evidence. Woodall also presented testimony from Jane Vick, one of his tenth-grade teachers. Vick had referred Woodall for an evaluation to determine if he was educationally mentally handicapped, which he was later found to be. Woodall's special education records were also admitted into evidence. Finally, Woodall presented testimony from Jennifer Walling, who had previously worked for the Kentucky Department of Public Advocacy (DPA) and had been a mitigation specialist assigned to Woodall's case in 1997 and 1998. She testified regarding her observations which led her to believe Woodall may be of low intellectual functioning.

The Commonwealth presented testimony from Jessica Woods, a medical records manager at the Kentucky Correctional Psychiatric Center (KCPC). She served to authenticate the KCPC records from Woodall's admittance there in 1998. The Commonwealth also presented testimony from retired Kentucky State Police (KSP) Detective Stacy Blackburn. Blackburn had interviewed Woodall regarding a 1992 sexual abuse case. Blackburn testified that Woodall waived his Miranda rights and eventually signed a written statement that Blackburn had prepared.

The Commonwealth also sought to admit Woodall's KCPC records, which included a report written by Dr. Richard Johnson, a Licensed Clinical

4

Psychologist, who evaluated Woodall while he was a patient at KCPC in 1998. Woodall objected to the admission of these documents, and the trial court allowed both oral argument and written briefing on the issue. Woodall objected specifically to the admission of Dr. Johnson's report without accompanying testimony from Dr. Johnson on the basis that it violated his constitutional rights to confront and cross examine witnesses called against him. Ultimately, the trial court admitted all KCPC records, other than Dr. Johnson's report, for the data and information they contained but not for any opinions that were expressed in them. The trial court admitted Dr. Johnson's report in total, including his opinions rendered, finding it to be both relevant and admissible.

After reviewing all of the evidence submitted, the trial court entered an order finding that Woodall had not proven by the preponderance of the evidence that he is intellectually disabled. The trial court therefore denied Woodall's Motion to Vacate the Death Sentence Due to Intellectual Disability. Woodall has now appealed to this Court. Additional facts will be described as relevant and necessary for our analysis.

## II. ANALYSIS

To this Court, Woodall argues that the trial court abused its discretion in denying his CR 60.02 motion. He argues that he is intellectually disabled and that the Eighth Amendment to the United States Constitution prohibits his execution. As a corollary to that argument, Woodall asserts that the trial court's finding that he did not prove by a preponderance of the evidence that he is intellectually disabled was not supported by substantial evidence. Woodall

5

also argues that the trial court erred in admitting and relying on Dr. Johnson's report generated pursuant to his evaluation of Woodall at KCPC in 1998 without requiring that Dr. Johnson testify at the hearing and be subject to cross-examination. Woodall asserts that this violated both his Confrontation Clause rights and his Due Process rights.[2] He further argues that Dr. Johnson's report was not relevant and should have been excluded on that basis as well.

Ordinarily, whether a defendant is entitled to the extraordinary relief provided by CR 60.02 is a matter left to the "sound discretion of the court and the exercise of that discretion will not be disturbed on appeal except for abuse." *Brown v. Commonwealth*, 932 S.W.2d 359, 362 (Ky. 1996) (quoting *Richardson v. Brunner*, 327 S.W.2d 572, 574 (Ky. 1959)). However, in this case, the trial court would not have had any discretion to deny Woodall's motion if it found that he was intellectually disabled, as it would have been unquestionably unconstitutional to subject him to the death penalty if he was intellectually disabled. We address each of Woodall's arguments and their appropriate standards of review below, although we do not do so in the order they are presented to us.

A. Relevancy

In *Atkins v. Virginia*, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits the execution of

---

[2] Woodall makes these arguments under the United States Constitution. He does not make any claims under the Kentucky Constitution.

a person who has an intellectual disability. 536 U.S. 304, 321 (2002). In *Hall v. Florida*, the U.S. Supreme Court held that a rigid and bright-line IQ test score cut off for determining intellectual disability was unconstitutional. 572 U.S. 701, 723 (2014). Finally, in *Moore v. Texas*, the U.S. Supreme Court offered additional guidance to states in assessing intellectual disability by emphasizing that prevailing medical standards should guide a court's determination of whether a criminal defendant is intellectually disabled and thus exempt from the death penalty. 581 U.S. 1, 15 (2017).

Dr. Johnson's evaluation of Woodall occurred in 1998, and his report was generated shortly thereafter. This was, obviously, prior to even *Atkins*, let alone *Hall* and *Moore*. Because of this, Dr. Johnson's evaluation of Woodall did not include any assessments specific to the issue of Woodall's adaptive functioning, as Dr. Johnson's focus was on the bright-line IQ score. Woodall argues that because Dr. Johnson's evaluation did not include any adaptive functioning assessments—as now required for the trial court to consider under Supreme Court precedent and professional norms—Dr. Johnson's report was not relevant and should have been excluded.

Relevancy is a low bar. *Hall v. Commonwealth*, 468 S.W.3d 814, 832 (Ky. 2015). Under Kentucky Rule of Evidence (KRE) 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, all relevant evidence is admissible unless excluded by constitution, statute, or rule. KRE 402. "We

7

give substantial deference to a trial court's relevancy decisions. And 'we will not disturb the decisions of the trial court without a clear showing of abuse of discretion.'" *Kerr v. Commonwealth*, 400 S.W.3d 250, 259 (Ky. 2013) (quoting *Webb v. Commonwealth*, 387 S.W.3d 319, 325 (Ky. 2012)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

In this case, Dr. Johnson's report explained that Woodall was to "be examined to determine whether he has any significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period, and if so, whether the same may exist concurrently with any mental illness or insanity." Dr. Johnson's report was focused on whether "at the time of the alleged offense as a result of mental retardation, Mr. Woodall lacked the substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."[3] However, it still included an evaluation of both Woodall's intellectual function and his adaptive functioning deficits. Dr. Johnson concluded that there was not "any evidence of mental retardation (IQ scores of less than 70 and deficits in adaptive behavior functioning)." The fact that Dr. Johnson reached this conclusion prior to the U.S. Supreme Court's decisions in *Hall* and *Moore* and did not include adaptive functioning

---

[3] The phrase "mental retardation" is no longer used and has been replaced with "intellectual disability."

assessments does not make it completely irrelevant. The report still contained information that had some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without" the report. KRE 401. Instead of going to admissibility, the lack of adaptive functioning assessments bears on the question of weight to be given to the report. The trial court was free to weigh this in reaching its ultimate conclusions in this case. Accordingly, the trial court did not abuse its discretion in admitting Dr. Johnson's report based on relevancy.

B. Due Process

Woodall also argues that the trial court's admission of Dr. Johnson's report without live testimony from Dr. Johnson, at which he would have been subject to cross-examination by Woodall, violated his due process rights under the Fourteenth Amendment to the United States Constitution. We review this question de novo. *Commonwealth v. Riker*, 573 S.W.3d 622 (Ky. 2018) (citing *Caesars Riverboat Casino, LLC v. Beach,* 336 S.W.3d 51, 54 (Ky. 2011)).

We have previously explained that "[d]ue process is a malleable concept, conforming to meet the particular circumstances." *Ramirez v. Nietzel*, 424 S.W.3d 911, 917 (Ky. 2014). The U.S. Supreme Court has not yet addressed the precise amount of process that is due a criminal defendant in a post-conviction challenge to a death sentence based on an allegation of intellectual disability. However, it has done so, at least in a broad way, for claims of insanity. *Ford v. Wainwright,* 477 U.S. 399 (1986).

9

In *Ford v. Wainwright*, the U.S. Supreme Court was severely fractured. *Id.* The Court had to decide if the Eighth Amendment to the U.S. Constitution prohibits states from executing prisoners who are insane and, if so, what procedures are required for a state court to make an insanity determination. *Id.* at 405. Seven members of that Court agreed that executing a prisoner who is insane is unconstitutional. *Id.* at 409–10. All seven of those members further agreed that, at a minimum, a defendant is entitled to the opportunity to be heard on the issue of whether he is insane. *Id.* at 413–14, 424–25, 430. This agreement, however, spanned three separate opinions, each with differing views of the procedures required, and none of which garnered a majority of the Court.

Justice Marshall wrote for himself and three other members of the Court. He emphasized the importance of accurate fact finding, given that the "decision affect[s] the life or death of a human being." *Id.* at 411. He explained that "the factfinder must 'have before it all possible relevant information about the individual defendant whose fate it must determine.'" *Id.* at 413 (quoting *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (plurality opinion)). He went on to state that "any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate." *Id.* at 414.

Justice Marshall further explained that "[c]ross-examination of the psychiatrists, or perhaps a less formal equivalent, would contribute markedly to the process of seeking truth in sanity disputes" and that "[w]ithout some

10

questioning . . . a factfinder simply cannot be expected to evaluate the various opinions, particularly when they are themselves inconsistent." *Id.* at 415. Despite these statements, Justice Marshall also explained that he and the other three members of the Court for whom he was writing "do not . . . suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.* at 416–17. He explained that various "legitimate pragmatic considerations may . . . supply the boundaries of the procedural safeguards that feasibly can be provided." *Id.* at 417.

Although Justice Marshall's opinion was the lead opinion, it did not carry a majority of the Court regarding the extent of the procedures required in a state's determination of whether a defendant was insane and thus ineligible for the death penalty. Justice Powell and Justice O'Connor, who was joined by Justice White, also wrote on the procedures they deemed necessary to protect a defendant's due process rights in a post-trial insanity claim.

Justice Powell agreed with Justice Marshall that a defendant is entitled to an opportunity to be heard. *Id.* at 424 (Powell, J., concurring in part and concurring in the judgment). He believed, however, that "a constitutionally acceptable procedure may be far less formal than a trial." *Id.* at 426. He summarized his view by explaining,

> The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the

11

State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied[.]

*Id.* at 427.

Justice O'Connor, writing for herself and Justice White, explained that, in their view, "[i]f there is one 'fundamental requisite' of due process, it is that an individual is entitled to an 'opportunity to be heard.'" *Id.* at 430 (O'Connor, J., concurring in the result in part and dissenting in part) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). She further explained that although "[t]he prisoner's interest in avoiding an erroneous determination is, of course, very great. . . . it [is] self-evident that once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly." *Id.* at 429 (citing *Meachum v. Fano*, 427 U.S. 215, 224 (1976)). She summarizes her view by saying, "While I would not invariably require oral advocacy or even cross-examination, due process at the very least requires that the decisionmaker consider the prisoner's written submissions." *Id.* at 430.

The only thing all three of these opinions have in common regarding the required procedure, and thus the only process that is necessarily due to a prisoner challenging his death sentence due to insanity, is the opportunity to be heard. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as

12

that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). If there was any question about this, in 2007, the U.S. Supreme Court reinforced that "*Ford* requires, at a minimum, that a court allow a prisoner's counsel the opportunity to make an adequate response to evidence solicited by the state court." *Panetti v. Quarterman*, 551 U.S. 930, 952 (2007). In *Panetti*, the Court declined to "address whether other procedures, such as the opportunity for discovery or for the cross-examination of witnesses, would in some cases be required under the Due Process Clause." *Id.*

Although *Wainwright* and *Panetti* both addressed the procedural due process requirements of a post-conviction attack on a death sentence due to insanity, we see no reason why this same analysis does not apply to a post-conviction attack on a death sentence due to intellectual disability. The same interests are at stake, and the determinations made by the trial court are sufficiently similar. Accordingly, we conclude the trial court was only required to provide Woodall with an opportunity to be heard in order for his due process rights to be vindicated. In this case, he was given that opportunity.

Woodall was provided with state funds to hire his own expert to opine on whether he was intellectually disabled. This expert, Dr. Fabian, evaluated him, wrote a report, and testified for a full day at his CR 60.02 evidentiary hearing. Dr. Fabian also observed the testimony of the Commonwealth's witnesses and reviewed all of the documents the Commonwealth submitted in support of its claim that Woodall was not intellectually disabled. Dr. Fabian was then

13

permitted to again testify and refute the Commonwealth's evidence. Dr. Fabian specifically sought to discredit Dr. Johnson's report and conclusions by testifying that the report's "fatal flaw" was that Dr. Johnson did not conduct any adaptive functioning assessment as was required by professional norms.

Woodall was also permitted to call other witnesses in addition to Dr. Fabian and to cross-examine the witnesses that the Commonwealth called to testify. Regarding Dr. Johnson, specifically, the trial court noted that Woodall called Dr. Johnson to testify at his original sentencing trial in mitigation. Although it does not appear that the trial court relied heavily on Dr. Johnson's trial testimony, it was a consideration in that court's decision to admit Dr. Johnson's report. Given all of the circumstances in the case at bar, along with U.S. Supreme Court controlling precedent on this issue, we cannot hold that Woodall's due process rights were violated. Woodall had a full and fair opportunity to be heard at his CR 60.02 evidentiary hearing.

C. Confrontation Clause

Woodall also argues that the trial court's admission of Dr. Johnson's report without live testimony and an opportunity to cross-examine him violated Woodall's Confrontation Clause rights under the United States Constitution. We review issues of constitutional interpretation de novo. *Maupin v. Commonwealth*, 542 S.W.3d 926, 928 (Ky. 2018).

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The U.S. Supreme Court has held that this

14

guarantee applies to both federal and state prosecutions. *Pointer v. Texas,* 380 U.S. 400, 406 (1965). That Court has explained that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama,* 380 U.S. 415, 418 (1965).

The primary U.S. Supreme Court case upon which Woodall relies is *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009). In *Melendez-Diaz,* the trial court admitted into evidence at trial "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." *Id.* at 307. The trial court did this without requiring the laboratory analysts to testify in person. *Id.* at 309. The U.S. Supreme Court, relying on its earlier decision in *Crawford v. Washington,* 541 U.S. 36, 54 (2004), held that the defendant's Confrontation Clause rights were violated because there was no "showing that the analysts were unavailable to testify at **trial**" and that the defendant "had a prior opportunity to cross-examine them." *Id.* at 311 (emphasis added).

Woodall does not cite to any case binding on this Court that extends the application of the Confrontation Clause beyond the guilt phase of a trial. Our own research also does not reveal any binding precedent requiring application of the Confrontation Clause to a post-conviction collateral attack such as the one before us today.

The seminal U.S. Supreme Court cases that address the application of the Confrontation Clause do so in the context of the guilt phase of a trial and speak directly to witnesses who do not testify at trial. *E.g., Pointer,* 380 U.S. at

15

404 ("The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair **trial** in a criminal prosecution." (emphasis added)); *Crawford*, 541 U.S. at 53–54 ("[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at **trial** unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (emphasis added)); *Bullcoming v. New Mexico*, 564 U.S. 647, 657 (2011) ("As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at **trial** unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." (emphasis added)). *But see Kentucky v. Stincer*, 482 U.S. 730 (1987) (applying the Confrontation Clause to a witness competency hearing held mid-trial).

Having found no precedent to support extending the Confrontation Clause's protections to a post-conviction collateral attack on a death sentence, we decline to do so today. Accordingly, we hold that Woodall's Confrontation Clause rights were not violated by the admission of Dr. Johnson's report without the opportunity to cross-examine Dr. Johnson.

D. Sufficiency of the Evidence

Finally, Woodall argues that the trial court's finding that he did not prove he is intellectually disabled by a preponderance of the evidence was not supported by substantial evidence and ignored prevailing medical standards.

16

He further argues that he did, in fact, present sufficient evidence that he is intellectually disabled and cannot be subject to the death penalty.

As previously explained, a trial court's determination of whether a criminal defendant is intellectually disabled is "akin to a totality of the circumstances test." *Woodall*, 563 S.W.3d at 6. This test has

> three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—*i.e.,* a score of roughly 70—adjusted for the standard error of measurement; (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances,); and (3) the onset of these deficits while still a minor.

*Id.* at 6–7 (quoting *Moore*, 581 U.S. at 7) (internal quotation marks omitted). "[I]n addition to ascertaining intellectual disability using this test, prevailing medical standards should always take precedence in a court's determination." *Id.* at 7. The defendant bears the burden of proving intellectual disability by a preponderance of the evidence. *Id.* at 6 n.29.

A trial court's determination of intellectual disability is a very fact-specific inquiry. Because of this, we review the trial court's factual findings for clear error. CR 52.01. "Under this standard, the trial court's findings of fact will be conclusive if they are supported by substantial evidence." *Simpson v. Commonwealth*, 474 S.W.3d 544, 547 (Ky. 2015). "Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Smyzer v. B.F. Goodrich Chem. Co.,* 474 S.W.2d 367, 369 (Ky. 1971). However, we review a trial court's

17

application of the law to the facts de novo. *Commonwealth v. Crowe*, 610 S.W.3d 218, 224 (Ky. 2020).

We are compelled to first address Woodall's claim that the trial court should be reversed solely because it relied in part on Dr. Johnson's report. Woodall seems to assert that because Dr. Johnson's report was used as evidence at Woodall's pre-*Atkins* sentencing trial, reliance on it in an *Atkins* hearing amounted to automatic reversible error. To support this assertion, Woodall cites to *Brumfield v. Cain*, 576 U.S. 305 (2015); however, the procedural posture of *Brumfield* is sufficiently different from the posture of Woodall's case to reject its application.

Brumfield had been sentenced to death in a Louisiana state court at a time when U.S. Supreme Court precedent permitted the imposition of the death penalty on a person with an intellectual disability. *Id.* at 308. After the Supreme Court rendered *Atkins*, Brumfield raised a post-conviction *Atkins* claim, seeking to invalidate his death sentence due to his intellectual disability. *Id.* at 309. He sought an evidentiary hearing and pointed to mitigation evidence that was offered at his trial to support his request. *Id.* Brumfield further sought funds to obtain experts to provide evidence supporting his claim. *Id.* at 310. The Louisiana trial court dismissed his petition without holding a hearing or granting funds for Brumfield to conduct additional investigation. *Id.* The trial court relied in large part on the testimony presented at Brumfield's original trial in making its determination. *Id.*

Brumfield filed a petition for habeas corpus in federal court. *Id.* at 311. On review of that petition, the U.S. Supreme Court noted that "in seeking an evidentiary hearing, Brumfield was not obligated to show that he was intellectually disabled, or even that he would likely be able to prove as much. Rather, Brumfield needed only raise a 'reasonable doubt' as to his intellectual disability to be entitled to an evidentiary hearing." *Id.* at 320. The Court explained that "Brumfield had not yet had the opportunity to develop the record for the purpose of proving an intellectual disability claim. At his pre-*Atkins* trial, Brumfield had little reason to investigate or present evidence relating to intellectual disability." *Id.* at 321. It even explained that at a trial "conducted prior to *Atkins*, the defense's trial strategy may have been to shift the focus away from any diagnosis of mental retardation." *Id.* (internal quotation marks omitted). Accordingly, the Supreme Court held that "the state trial court should have taken into account that the evidence before it was sought and introduced at a time when Brumfield's intellectual disability was not at issue. The court's failure to do so resulted in an unreasonable determination of the facts." *Id.* at 322.

After a thorough review, we cannot conclude that *Brumfield* stands for the proposition that any reliance on evidence introduced at a pre-*Atkins* trial is reversible error in a hearing held pursuant to *Atkins*. Instead, *Brumfield* merely held that the evidence elicited at Brumfield's pre-*Atkins* trial was sufficient to raise a reasonable doubt as to his asserted intellectual disability and, as such, Brumfield was entitled to an evidentiary hearing on the matter. *Id.* at 321.

We turn now to the factual findings made by the trial court in the case at bar. The trial court in this case issued an eleven-page order, of which seven pages were dedicated to its factual findings. Regarding Woodall's intellectual functioning, the trial court first looked at Woodall's multiple IQ test scores. The trial court found that "[t]he professionals agreed that the general ranges of intellectual functioning relevant to this case are as follows: average is 80-89; borderline is 70-79; and previously the level of intellectual disability had been a score of less than 70, without taking into consideration the standard error of measurement."

The trial court then found that Woodall took an IQ test for the first time in 1991, when he was 17 years old. This test was administered by Dr. Harry Robe and Kay Willey, and Woodall's full scale IQ score on that test was 74. Considering the standard error of measurement, Woodall's actual score fell within the range of 69 to 79. Dr. Robe testified at Woodall's original sentencing trial and opined that Woodall was in the Educable Mentally Handicapped category, "or borderline range of functioning." The trial court further noted that when the Flynn Effect[4] was applied to the 1991 IQ test, Woodall's score became a 71, which is in the intellectually disabled range.

---

[4] As described in the trial court's order, the Flynn Effect "'essentially leads to adjusting scores for the obsolescence of normative standards.' This takes into consideration the passage of time from the standardization of the particular IQ test since the population in general has a gradual change in average performance on IQ tests 'indicating that normative standards become less stringent over time.'" According to Dr. Fabian, IQ test scores change at a rate of approximately 0.30 to 0.33 points per year.

The trial court further found that Dr. Johnson administered an IQ test to Woodall in 1998, when Woodall was almost 23 years old. His full scale IQ score on that test was 78. Dr. Johnson testified at Woodall's original sentencing trial and "opined that this score was in the 'borderline' area of mental functioning which he stated was from 70-79." Dr. Johnson further testified that the standard error of measurement for the test he administered was +/- 3 points, so Woodall's actual IQ score was in the range of 75-81. Dr. Johnson testified this was "still in the borderline area of mental functioning." The trial court then noted that if the five point standard error of measurement was used on the IQ test Dr. Johnson administered, Woodall's actual IQ score would be in the 73-83 range. The trial court further found that even factoring in the Flynn Effect to Woodall's 1998 IQ test score, his score would be 77, which was "still above the intellectual disability cut-off."

The trial court found that Dr. Fabian also administered an IQ test to Woodall in 2015. Woodall's full scale IQ on that test was a 69. Accounting for the standard error of measurement, his actual IQ score would be in the 64-74 range. Factoring in the Flynn Effect to the 2015 IQ test, Woodall's full scale IQ score would "drop to 66-67, still within the intellectual disability range according to Dr. Fabian." All of the trial court's factual findings regarding Woodall's IQ test scores are supported by substantial evidence.

The trial court further found that Woodall's "academic history and test scores were consistent in the average range on measures of reading skills and in the deficient range on measures of mathematical reasoning." It found that

21

some of Woodall's other psychological test scores "were higher than the intellectual disability range and some were within that range." It further found that "Woodall has relative strengths and weaknesses on the achievement tests." All of these factual findings are also supported by substantial evidence.

Regarding adaptive functioning, the trial court explained that deficits in this area include "the inability to learn basic skills and adjust behavior to changing circumstances, including conceptual, social, and practical skills learned and performed by people in their everyday lives." The trial court noted that Dr. Johnson believed that "Woodall did not have any 'serious mental illness that would prevent him from appreciating criminality of conduct.'" The trial court also listed the specific diagnoses Dr. Johnson assigned to Woodall, including borderline intellectual functioning.

The trial court then found that "[b]oth Dr. Johnson and Dr. Fabian reviewed Mr. Woodall's past history in adaptive functioning." The court then found that although

> Woodall did no formal banking, he did pay his own bills in cash
> and handled wages he earned to do so. He bought his own
> groceries and cooked for himself. He had a drivers license, but had
> no car insurance and would borrow a vehicle when necessary to
> drive. He was able to maneuver through mass transit when he was
> younger living in Chicago, and he could use a map. Since he was
> in good physical health, he had no regular medical care.

The trial court went on to find that Woodall "had worked at a sawmill, a chicken house, at construction, cutting tobacco, and at a car wash." He also "had never been married but reported that he had a previous fiancé and a son born in August 1997." Finally, the trial court found that Woodall had not been

a disciplinary problem while in prison and that he "wrote a coherent and logical letter to the warden" in an appeal of one disciplinary issue.

Woodall takes issue with these findings because they are "misleading, overstating Woodall's supposed adaptive functioning strengths and ignoring an adaptive functioning weakness." However, the trial court also found that Woodall's scores on "a battery of tests . . . related to adaptive functioning" were mixed. The court found that Woodall "scored well on some of the tests[,] above what was predicted for a person with intellectual disability and in other areas below that level, with many scores between the two." The trial court further found that Woodall's "overall scores on the Independent Living Skills tests placed him 'somewhere between the mild mentally retarded and the borderline IQ group averages[.]'" The trial court further acknowledged that "Dr. Fabian also opined that Mr. Woodall's insight and judgment were 'poor and he had very poor verbal skills.'"

Overall, Woodall's results on the adaptive functioning assessments, both the formal assessments as well as the informal observational assessments, were mixed. The trial court acknowledged these results, and its factual findings in this area were supported by substantial evidence.

We now turn to the final prong of the test for intellectual disability— whether the onset of the intellectual functioning and adaptive deficits occurred while Woodall was still a minor. The trial court found that Woodall "'consistently performed well in the areas of academic achievement' in school with better scores in reading and poorer scores in mathematics." Woodall

argues that this factual finding is clearly erroneous because Woodall's high school grade point average was a .833, Woodall ranked 494 out of 658 students, and Woodall failed second or third grade. However, in making this factual finding, the trial court quoted directly from Dr. Fabian's (Woodall's expert) report. Dr. Fabian stated, "Mr. Woodall has consistently performed well in the areas of academic achievement. His academic testing always indicated good performance in language in [sic] reading skills, but very poor mathematics skills including the current assessment." It is reasonable to conclude that Dr. Fabian took into account Woodall's low grade point average, academic ranking, and failed grade when making this statement. Accordingly, the trial court's factual finding on this issue was supported by substantial evidence.

The trial court acknowledged that Dr. Fabian believed Woodall's intellectual disability existed before the age of 18. However, the court also found that Woodall underwent "no formal testing and therefore [there was] no formal diagnosis of intellectual disability before age 18." Woodall asserts that this factual finding is clearly erroneous because his "intellectual functioning was tested in the developmental period, at age 17." He admits that his adaptive functioning was not assessed but seems to assert that the absence of this assessment makes sense because at the time of that IQ test (on which Woodall scored approximately 74), there was a bright-line cut off of 70 to be diagnosed as intellectually disabled, and thus he could not have received this diagnosis. Given the context within which the trial court made this factual finding, we cannot hold that it was clearly erroneous. The trial court made other factual

24

findings acknowledging Woodall's IQ test results during the developmental period and was factually correct that Woodall did not receive a diagnosis of intellectual disability before he turned 18 years old.

The trial court made additional factual findings that Woodall did not graduate from high school and failed a GED test while he was incarcerated. The trial court also acknowledged that Dr. Fabian stated, "It is my opinion with [sic] a reasonable degree of psychological and neuropsychological certainty that there is significant evidence of a developmental and current intellectual disability." Woodall does not contest these findings, and we hold that they were supported by substantial evidence.

Finally, the trial court ultimately found

> Based upon the totality of the circumstances and considering all relevant facts set out in the testimony, admitted exhibits, and the record, including a consideration of prevailing medical standards in regard to intellectual disability, despite the opinion of Dr. Fabian, the Court finds that the Defendant/Movant has not proved by a preponderance of the evidence that he was intellectually disabled at the time of this offense on January 25, 1997, nor at the time of his guilty plea on April 10, 1998, nor at the time of his sentencing after a sentencing trial on September 4, 1998, nor at the present. While Mr. Woodall had obvious deficits and they were noted by all three professional examiners, Mr. Woodall's adaptive behavior conceptually, socially, and practically show that he was able to overcome the deficits and live a normal life before and after age 18.

In his briefing to this Court, Woodall points to various pieces of evidence that could have led a factfinder to find that he was intellectually disabled. For instance, he notes that he was declared educationally mentally handicapped, and that this was evidence that he had an intellectual disability during the developmental period. He also points to evidence that could contradict some of

25

the trial court's factual findings, such as the fact that he scored in the lowest seventh percentile of the population on a map reading task administered by Dr. Fabian.

Despite the evidence that could have led a factfinder to a different result, we cannot hold that the trial court's factual findings in this case are clearly erroneous. Especially important is that the determination of whether a criminal defendant is intellectually disabled is "akin to a totality of the circumstances test." *Woodall*, 563 S.W.3d at 6. Further, the burden of proving intellectual disability by a preponderance of the evidence is on the defendant. *Id.* at 6 n.29. We are further persuaded by Dr. Fabian's acknowledgement during his testimony of the limitations of his assessments. He acknowledged that he would have liked to have had assessments of Woodall's functioning in elementary and middle school. He also said that Woodall's limited work history was a "limitation" that existed in this case. Dr. Fabian further asserted that while it is possible to make a retrospective diagnosis of intellectual disability, Woodall's case was "tough" because there were no family members or friends who could provide information about his intellectual and adaptive functioning prior to age 18.

Given all of the evidence heard by the trial court, much of which was conflicting, or at least inconsistent, as to Woodall's deficits, we conclude that the trial court's factual finding that Woodall did not prove that he is intellectually disabled by a preponderance of the evidence is supported by substantial evidence.

26

## III. CONCLUSION

For the foregoing reasons, we affirm the order of the Caldwell Circuit Court.

All sitting. All concur. Thompson, J., concurs with separate opinion in which Conley and Lambert, JJ., join.

THOMPSON, J., CONCURRING: I concur with the affirmance of the trial court's determination that Woodall was not intellectually disabled. However, I must write separately to address failings I see with the manner in which the Commonwealth sought to rebut Woodall's position.

Once a defendant has made a *prima facie* showing that an intellectual disability disqualifies the defendant from execution, the burden shifts to the Commonwealth to counter such evidence. To meet such burden in an *Atkins*[5] hearing, the Commonwealth should retain and offer its own expert to analyze prior information and offer testimony on the issue of whether a defendant suffered from an intellectual disability during the defendant's developmental years based upon contemporary medical standards. It is improper for the Commonwealth to rely on an outdated expert report to satisfy its burden. While in this case that error is not dispositive, such an error could provide the basis for reversal in another case.

Dr. Johnson's 1998 report was not developed to establish Woodall's intellectual capacity for purposes of an *Atkins*-type determination. In fact, the

---

[5] *Atkins v. Virginia,* 536 U.S. 304 (2002).

27

report predates *Atkins* by four years. The intended purpose of the report was to determine whether "*at the time of the alleged offense as a result of mental retardation, Mr. Woodall lacked the substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.*" While Dr. Johnson's report considered indicia of "mental retardation," the report looked more towards drawing conclusions as to whether such deficits, to the extent they may have existed, affected Woodall's recognition of his conduct and his ability to follow the law and therefore was not a *per se* determination of intellectual disability.

Dr. Johnson's use of the now foresworn term "mental retardation" highlights the fact the report falls well-behind current medical standards and may have relied upon outdated approaches when, as a rule, such determinations should be "informed by the medical community's [current] diagnostic framework." *Hall v. Florida*, 572 U.S. 701, 721 (2014). When *Hall* was decided in 2014, the United State Supreme Court looked to the then-current editions of the AAID[6] and DSM[7] and we should follow suit. *Id.* at 705, 710, 712, 722-23.

Fortunately for the Commonwealth's position, Dr. Johnson's report contained a substantial amount of relevant information drawn from Woodall's

---

[6] American Association on Intellectual and Developmental Disabilities, R. Schalock et al., *User's Guide to Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports* 22 (2012) (AAIDD-11).

[7] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013) (DSM-5).

28

school records and academic history including testing performed when he was in the tenth grade. Further, Dr. Johnson administered a WAIS-III[8] test to Woodall when he was twenty-three years old.[9]

It is only due to (a) the nature and amount of objective data collected by Dr. Johnson; (b) significant evidence of Woodall's adaptive behavior and functioning prior to the offense; (c) the inconsistencies in Woodall's own evidence; and (d) the skill and patience exhibited by the trial court in analyzing all the information it had, that I can find the error in admitting Dr. Johnson's report to be harmless and agree that the trial court correctly determined that Woodall had failed to prove by a preponderance of the evidence that he was intellectually disabled and, thus, ineligible to receive the death penalty.

Conley and Lambert, JJ., join.

---

[8] Wechsler Adult Intelligence Scale (3rd ed.)

[9] In the context of death penalty eligibility, an "intellectual disability" is one that is the result of a condition that appears at birth or during the person's childhood or "developmental period" which is defined by the AAIDD as "before the age of twenty-two. An intellectual disability is not an after-acquired disability and a person's lower I.Q. scores later in life could be caused by accidents, diseases, or lifestyle choices. *See FAQs on Intellectual Disability*, American Association of Intellectual and Developmental Disabilities, https://www.aaidd.org/intellectual-disability/faqs-on-intellectual-disability (last visited Apr. 17, 2024).

COUNSEL FOR APPELLANT:

Dennis James Burke
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General